**CT Corporation**

TO: Ann Aber
Jo-Ann Stores, LLC
5555 DARROW RD
HUDSON, OH 44236-4054

RE: **Process Served in Alaska**

FOR: Jo-Ann Stores, LLC  (Domestic State: OH)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Furniture Enterprises of Alaska, Inc, Pltf. vs. Jo-Ann Store, LLC, Dft. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # 3AN2008105CI |
| **NATURE OF ACTION:** | Property Damage Litigation |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Juneau, AK |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 10/05/2020 at 13:49 |
| **JURISDICTION SERVED :** | Alaska |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 10/06/2020, Expected Purge Date: 10/11/2020 |
| | Image SOP |
| | Email Notification,  Ann Aber  ann.aber@joann.com |
| | Email Notification,  Liz Sargent  liz.sargent@joann.com |
| | Email Notification,  Robert Icsman  bob.icsman@joann.com |
| | Email Notification,  Melana Collins  melana.collins@joann.com |
| | Email Notification,  James Weikamp  james.weikamp@joann.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 208 South LaSalle Street<br>Suite 814<br>Chicago, IL 60604 |
| **For Questions:** | 866-331-2303<br>CentralTeam1@wolterskluwer.com |

Page 1 of  1 / MG

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of the package only, not contents.

IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
AT ANCHORAGE

COPY
Original Received

SEP 2 3 2020

Clerk of the Trial Courts

FURNITURE ENTERPRISES OF )
ALASKA, INC )
_____ )
                Plaintiff(s), )
                               )
vs.                            )
                               )
                               )
JO-ANN STORES, LLC             )
                               )     CASE NO. 3AN-20- O8105    CI
_____ )
                Defendant(s). )     **SUMMONS AND**
_____ )     **NOTICE TO BOTH PARTIES**
                               )     **OF JUDICIAL ASSIGNMENT**

To Defendant: Jo-Ann Stores, LLC _____

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) Jennifer M. Coughlin _____, whose address is: 701 W 8th Avenue, Suite 1100, Anchorage, AK 99501 _____.

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at https://public.courts.alaska.gov/web/forms/docs/tf-955.pdf to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

☒ This case has been assigned to Superior Court Judge _Garton_
  and to a magistrate judge.

☐ This case has been assigned to District Court Judge _____.

                                    CLERK OF COURT

_9/23/2020_                         By: _Alan Zeilut_
Date                                    Deputy Clerk

I certify that on _9/23/20_ a copy of this Summons was  ☐ mailed  ☒ given to
☐ plaintiff  ☒ plaintiff's counsel along with a copy of the
☐ Domestic Relations Procedural Order  ☐ Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk _HL_

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (10/17)(cs)                    Civil Rules 4, 5, 12, 42(c), 55
SUMMONS                                                    **EXHIBIT A**

Jennifer M. Coughlin
Landye Bennett Blumstein LLP
701 West 8th Avenue, Suite 1100
Anchorage, AK 99501
Tel: (907) 276-5152
Facsimile: (907) 276-8433
jenniferc@lbblawyers.com
Attorneys for Plaintiff

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

COPY

Original Received

SEP 2 3 2020

Clerk of the Trial Courts

|  |  |
|---|---|
| FURNITURE ENTERPRISES OF ALASKA, INC.<br><br>Plaintiff,<br><br>v.<br><br>JO-ANN STORES, LLC<br><br>Defendant. | Case No. 3AN-20-_08105_ CI |

## COMPLAINT

Comes now, Plaintiff Furniture Enterprises of Alaska, Inc., ("FEA"), by and through its attorneys of record, Landye Bennett Blumstein LLP, and for its causes of action allege as follows:

### FACTUAL ALLEGATIONS

1. FEA is a corporation organized and existing under the laws of the State of Alaska.

2. Defendant Jo-Ann Stores, LLC ("Jo-Ann Stores") is believed to be a limited liability company organized and existing under the laws of the State of Ohio.

LANDYE BENNETT BLUMSTEIN LLP
701 WEST 8TH AVENUE, SUITE 1100
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

3. FEA owns the real estate known as the University Center, where the premises that are the subject of this suit (the "Premises") are located. Jo-Ann Stores is a tenant at the University Center. Attached as Exhibit A is a true and correct copy of the lease between the parties dated August 8, 2019 (the "Lease").

4. The Lease required FEA to complete certain construction tasks ("Landlord's Work") relating to delivery of the shell of the Premises, while Jo-Ann accepted responsibility for completing other tasks relating to the build-out of the interior. Section 10 of the Lease required Jo-Ann Stores to approve proposed plans and specifications regarding the Landlord's Work (the "Landlord's Approved Plans"), which would include the items set out as FEA's responsibility in Exhibit C to the Lease (the "Exhibit C Matrix").

5. As set forth in Sections 7.4. and 7.5 of the Exhibit C Matrix regarding plumbing, FEA was responsible for providing "dedicated sprinkler main above 14'-0" AFF" and "dedicated sprinkler branch lines/upturned heads at roof deck of shell." Under Section 7.7 of the Matrix, FEA was also supposed to provide "fire sprinkler system/monitoring-new and/or modifications for building shell compliance." All other activities in the plumbing section of the Matrix were Jo-Ann Stores' responsibility, including work required on the "dedicated sprinkler branch lines/modification of heads due to tenant interior build-out."

6. The Landlord's Approved Plans referenced in Section 10(b) of the Lease contain further confirmation that FEA's responsibilities regarding the sprinkler system were limited to providing a sprinkler system that met the applicable code for core and

COMPLAINT
*Furniture Enterprises of Alaska, Inc. v. Jo-Ann Stores, LLC,* Case No. 3AN-20-_____CI
Page 2 of 8

**EXHIBIT A**
**Page 4 of 88**

LANDYE BENNETT BLUMSTEIN LLP
701 WEST 8TH AVENUE, SUITE 1100
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

shell conditions only, with Jo-Ann Stores being responsible for any sprinkler system modifications required as a result of its build-out and operation as a retail fabric store.

7.     FEA did all of the work necessary to meet its obligations under the Exhibit C Matrix and the Landlord's Approved Plans, including but not limited to changing the angle of the sprinkler heads to conform with the Exhibit C Matrix and the Landlord's Approved Plans.  The Anchorage Fire Department confirmed that the existing sprinkler system with upturned heads met all code requirements when the building was delivered to Jo-Ann Stores as an exposed structure shell, prior to Jo-Ann Stores' completing its build-out work on the interior.

8.     Representatives of the parties did a joint walk-through of the Premises on October 29, 2019.  By email dated November 1, 2019, David Geibel, Jo-Ann Stores' Manager for Construction and Store Facilities, informed FEA that Jo-Ann Stores would prepare a conditional acceptance letter "noting just the few items that you will be completing. . .".  The email notes that "sprinkler system is installed as expected; including dedicated flow and tamper alarm" and the only item relating to the sprinkler system that required any work on FEA's part was a notation that "[s]prinkler lines are held above 14' with the exception of the FDC pipe running along the exterior wall.  It is being scheduled and moved above 14' by [FEA]."  A true and correct of this email is attached as Exhibit B.

9.     On November 18, 2019, Jo-Ann Stores sent a letter conditionally accepted the Premises, subject to the completion of any punch list items noted on the walk-thru notes and report attached to the November 18, 2019 letter.  A true and correct

LANDYE BENNETT BLUMSTEIN LLP
701 WEST 8TH AVENUE, SUITE 1100
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

COMPLAINT
*Furniture Enterprises of Alaska, Inc. v. Jo-Ann Stores, LLC,* Case No. 3AN-20-_____CI
Page 3 of 8

**EXHIBIT A**

copy of the November 18, 2019 letter is attached as Exhibit C. As indicated in the Geibel email, the only punch list items relevant to the sprinkler system were a notation that

> 5.2 Sprinkler lines are held above 14' with the exception of the FDC pipe running along the exterior wall. It is being scheduled and moved above 14' by [FEA]. . .

> 7.4 FDC line is too low and is being relocated.

> The sprinkler system work noted above was completed at FEA's expenses on or about November 5, 2019.

10. While the sprinkler system met all code requirements for installation in the building shell, the nature of Jo-Ann Stores' operations required modifications to meet code requirements after the shell was built out for use as a retail fabric store. Jo-Ann Stores was aware of its responsibility for these additional code requirements, including but not limited to the possibility that it would have to pay for installation of a fire pump if hydrant test data indicated that it was necessary. Indeed, Jo-Ann Stores had already obtained at least one bid for the additional sprinkler modifications for which Jo-Ann Stores would be responsible in September, 2019, prior to its conditional acceptance of the Premises. In addition, Section 18(c) of the Lease acknowledges the possibility that Jo-Ann Stores may install different or additional sprinkler systems as part of its Tenant's Work, in which case, Jo-Ann Stores shall be solely responsible for repairs or replacement of that modified or replacement system.

11. At a meeting held on or about January 20, 2020, Jo-Ann Stores informed FEA for the first time that it would not accept the upturned sprinklers specifically

LANDYE BENNETT BLUMSTEIN LLP
701 WEST 8TH AVENUE, SUITE 1100
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

COMPLAINT
*Furniture Enterprises of Alaska, Inc. v. Jo-Ann Stores, LLC*, Case No. 3AN-20-_____CI
Page 4 of 8

**EXHIBIT A**

required in the Exhibit C Matrix and which had been approved at the time of Jo-Ann Stores' conditional acceptance. Jo-Ann Stores demanded that FEA pay for the additional costs of changing the sprinkler system, including costs which had expressly been allocated to Jo-Ann Stores in the Exhibit C Matrix and the Landlord's Approved Plans.

12. On February 21, 2020, Jo-Ann Stores sent a Notice of Default to FEA, where Jo-Ann Stores took the position that FEA was solely responsible for ensuring that the sprinkler system complied with all code requirements, regardless of whether the failure to meet code was the result of work that was classified in the Exhibit C Matrix and the Landlord's Approved Plans as work to be done by FEA or by Jo-Ann's.

13. Jo-Ann Stores subsequently announced that it would perform the work that it claimed FEA was required to perform, but would seek to recover the cost of that work from FEA. FEA disagreed with Jo-Ann Stores' position.

14. Jo-Ann Stores' obligation under the Lease to pay rent and other charges due under the lease commenced on or about April 3, 2020 (151 days after the November 4, 2019 "Delivery Date" as defined in the Lease). Despite repeated demands, Jo-Ann Stores has failed to pay any amount due under the Lease.

## JURISDICTION AND VENUE

15. Jo-Ann Stores does business in Anchorage, Alaska, and the case involves the lease of real property in Anchorage, Alaska.

16. Jurisdiction is conferred upon the Court by AS 22.10.020.

17. Venue is proper in this court as the claim arose in this district.

LANDYE BENNETT BLUMSTEIN LLP
701 WEST 8TH AVENUE, SUITE 1100
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

LANDYE BENNETT BLUMSTEIN LLP
701 WEST 8TH AVENUE, SUITE 1100
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

## FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT ACTION

18.     Plaintiff FEA hereby realleges the allegations set forth in the above paragraphs as though fully set forth herein.

19.     A substantial controversy exists between FEA and Jo-Ann Stores as to the respective rights and obligations of these parties with regard to the sprinkler system on the Premises.

20.     FEA is entitled to a declaration that FEA complied with all of its obligations regarding delivery of the sprinkler system when it provided a sprinkler system that complied with the Exhibit C Matrix and the Landlord's Approved Plans.

## SECOND CAUSE OF ACTION: BREACH OF LEASE

21.     Plaintiff FEA hereby realleges the allegations set forth in the above paragraphs as though fully set forth herein.

22.     Under Section 27 of the Lease, Jo-Ann Stores is deemed in default if "Tenant fails to pay Rent on or before the due date and then fails to pay within 10 days after receipt of written notice from Landlord."

23.     On or about April 16, 2020 and again on June 15, 2020, FEA sent Jo-Ann Stores letters requesting payment of all amounts that were past due under the Lease. Failure to pay rent is an event of default under the Lease, and Jo-Ann Stores has failed to cure this default.

24.     Jo-Ann Stores owes FEA a duty to comply with the express terms of its agreement with FEA, as well as with the implied covenant of good faith and fair dealing.

COMPLAINT
*Furniture Enterprises of Alaska, Inc. v. Jo-Ann Stores, LLC*, Case No. 3AN-20-_____CI
Page 6 of 8

**EXHIBIT A**

25.     By engaging in the actions set forth above, Defendant Jo-Ann Stores has breached both of those duties.

26.     FEA is entitled to an award of damages for all amounts due to it under the Lease, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION:  TERMINATION OF LEASE

27.     Plaintiff FEA hereby realleges the allegations set forth in the above paragraphs as though fully set forth herein.

28.     Under Section 27 of the Lease, FEA has the right to terminate the lease if Jo-Ann Stores fails to pay rent and other charges on or about the due date, and then fails to pay the same within 10 days after receipt of written notice from FEA.

29.     Jo-Ann Stores has failed to pay rent of any kind under the lease, and has indicated its intention to continue to occupy the Premises without payment.

30.     FEA is entitled to a ruling that the Lease has terminated due to Jo-Ann Stores' material breach of the Lease term requiring it to pay rent, and to damages and such other relief as may be deemed to be appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Furniture Enterprises of Alaska, Inc. prays for the following relief:

1.     That Plaintiff FEA be awarded damages as set forth above in amounts to be proven at trial;

2.     That Plaintiff FEA be awarded attorney's fees and costs; and

LANDYE BENNETT BLUMSTEIN LLP
701 WEST 8TH AVENUE, SUITE 1100
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

COMPLAINT
*Furniture Enterprises of Alaska, Inc. v. Jo-Ann Stores, LLC,* Case No. 3AN-20-_____CI
Page 7 of 8

**EXHIBIT A**

# TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|

| SECTION 1. | EXHIBITS TO LEASE | 1 |
| SECTION 2. | DEFINITIONS | 2 |
| SECTION 3. | PREMISES | 7 |
| SECTION 4. | TERM AND OPTIONS TO EXTEND | 9 |
| SECTION 5. | FIXED MINIMUM RENT | 10 |
| SECTION 6. | PERCENTAGE RENT | 11 |
| SECTION 7. | GROSS SALES | 11 |
| SECTION 8. | TAXES | 14 |
| SECTION 9. | COMMON AREA COSTS | 16 |
| SECTION 10. | CONSTRUCTION OF PREMISES | 19 |
| SECTION 11. | USE | 23 |
| SECTION 12. | COMMON AREAS | 23 |
| SECTION 13. | UTILITIES | 24 |
| SECTION 14. | USE VIOLATION | 24 |
| SECTION 15. | CO-TENANCY | 25 |
| SECTION 16. | RULES AND REGULATIONS | 26 |
| SECTION 17. | ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT | 27 |
| SECTION 18. | REPAIRS AND MAINTENANCE | 27 |
| SECTION 19. | INDEMNIFICATION | 30 |
| SECTION 20. | WAIVER OF CLAIMS | 31 |
| SECTION 21. | PROPERTY AND LIABILITY INSURANCE | 31 |
| SECTION 22. | SIGNS | 33 |
| SECTION 23. | ASSIGNMENT AND SUBLETTING | 34 |
| SECTION 24. | REPAIR AFTER CASUALTY | 34 |
| SECTION 25. | CONDEMNATION | 36 |
| SECTION 26. | REPRESENTATIONS AND COVENANTS OF LANDLORD | 37 |
| SECTION 27. | TENANT'S DEFAULT | 40 |
| SECTION 28. | RIGHTS OF LANDLORD | 41 |
| SECTION 29. | LANDLORD'S DEFAULT | 42 |
| SECTION 30. | MORTGAGE SUBORDINATION | 42 |
| SECTION 31. | NO WAIVER | 43 |
| SECTION 32. | SURRENDER OF PREMISES | 43 |
| SECTION 33. | SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT | 44 |
| SECTION 34. | NOTICE | 44 |
| SECTION 35. | HAZARDOUS MATERIALS | 45 |
| SECTION 36. | LIMITATION OF LANDLORD'S LIABILITY | 47 |
| SECTION 37. | DELIVERY OF SITE PLAN | 47 |
| SECTION 38. | INTENTIONALLY OMITTED | 48 |
| SECTION 39. | ENTIRE AGREEMENT; WRITING REQUIRED | 48 |
| SECTION 40. | OPERATING COVENANT | 48 |

SECTION 41.   APPLICABLE LAW AND CONSTRUCTION............................................... 49
SECTION 42.   UNAVOIDABLE DELAYS....................................................................... 49
SECTION 43.   REASONABLE CONSENT....................................................................... 49
SECTION 44.   NO PARTNERSHIP ............................................................................... 50
SECTION 45.   ESTOPPEL ........................................................................................... 50
SECTION 46.   QUIET ENJOYMENT............................................................................ 50
SECTION 47.   HOLDING OVER ................................................................................. 50
SECTION 48.   BROKERS ............................................................................................ 49
SECTION 49.   INTENTIONALLY DELETED ................................................................ 51
SECTION 50.   CLAIMS LIMITATION ......................................................................... 51
SECTION 51.   CAPTIONS ........................................................................................... 51
SECTION 52.   VARIATION IN PRONOUNS.................................................................. 51
SECTION 53.   SECTION REFERENCES ....................................................................... 51
SECTION 54.   BINDING EFFECT OF AGREEMENT ..................................................... 51
SECTION 55.   ATTORNEY'S FEES ............................................................................. 52
SECTION 56.   OFAC WARRANTY.............................................................................. 52
SECTION 57.   PDF/COUNTERPART SIGNATURE ....................................................... 521

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.:  2584305v6

# LEASE

This Lease is made as of _August 8_ , 2019, between **Furniture Enterprises of Alaska, Inc.**, an Alaska corporation ("**Landlord**"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("**Tenant**").

Landlord and Tenant covenant and agree as follows:

## SECTION 1.  EXHIBITS TO LEASE

(a)     The following Exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit A.   The description of the lands upon which the Shopping Center is located.

Exhibit B.   The site plan showing the Shopping Center, the location of the Premises, as hereafter defined, the Shopping Center buildings, the parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit C.  Landlord's Work.

Exhibit D.  Tenant's Prototype Plans.

Exhibit D-1.  Tenant's Anchorage Signage Plans.

Exhibit E.  The Project Coordination Guidelines.

Exhibit F.  The Exclusive Uses of other tenants.

Exhibit G.  Form of Subordination, Non-Disturbance and Attornment Agreement.

Exhibit H.  Form of Estoppel Certificate.

(b) If there is any conflict or ambiguity between any approved plans and the language in this Lease or any Exhibit attached hereto, the approved plans shall supersede and control.

## SECTION 2. DEFINITIONS

The terms listed below have the respective meanings as follows:

(a)     Additional Rent: Tenant's Proportionate Share of Taxes (Section 8), Tenant's Proportionate Share of Common Area Costs (Section 9), and Tenant's Proportionate Share of Insurance Costs (Section 21).

(b)     Commencement Date: (i) the 151st day after the Delivery Date, or (ii) the day that Tenant opens for business in the Premises, whichever day first occurs. Notwithstanding anything to the contrary in this Lease, unless Tenant otherwise opens for business, the Commencement Date will not occur during any period that Tenant has not received all required governmental permits and approvals necessary for Tenant's occupancy, provided Tenant promptly applies for and diligently pursues obtaining such permits and approvals. Tenant may elect to open for business during any period identified in the immediately preceding sentence, and in such case, the Commencement Date shall be deemed to occur upon such opening. Also, notwithstanding the foregoing, in no event shall Tenant be required to open or commence the payment of Rent during the period commencing November 15 and ending the next occurring January 31 ("Blackout Period"); and, if the Commencement Date would otherwise occur in the Blackout Period (except for the reason that Tenant opens for business), the Commencement Date shall be deemed to be the first day after the expiration of the Blackout Period. If Tenant opens for business during the Blackout Period then the Commencement Date shall be deemed to have occurred upon such opening. If Tenant opens during the Blackout Period, then Tenant is obligated to pay only Substitute Rent during the Blackout Period.

(c)     Common Areas: the parking areas, driveways, aisles, sidewalks, malls (whether enclosed or unenclosed), truck storage areas, mechanical rooms, and other common, service and related areas and improvements within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, and whether or not shown on Exhibit B, but excluding the roof(s).

(d)     Default Rate: an annual rate of interest equal to the lesser of 10% per annum or the maximum amount allowed by law.

(e)     Delivery Date: the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements satisfied and Tenant accepts said delivery by written acknowledgment signed by Tenant's Senior Vice President of Real Estate, Vice President of Store Development or Director of Construction and Store Projects. Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises. The Delivery Date shall not occur prior to the Estimated Delivery Date (regardless of whether Landlord has satisfied the Delivery Requirements prior to that date), except with Tenant's express written consent, in its sole discretion.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

Exhibit A
Page 2 of 88
**EXHIBIT A**
**Page 13 of 88**

Case 3:20-cv-00272-JMK   Document 1-1   Filed 10/26/20   Page 13 of 88

(f)     "Delivery Requirements" means the following:

(1)     Landlord's Work is Substantially Complete (hereinafter defined);

(2)     the Premises are delivered to Tenant free and clear of any Hazardous Material (other than encapsulated asbestos in the drywall of the Premises and lead based paint coating certain structural components of the Shopping Center and Premises), provided that if after the date that the Delivery Date has otherwise occurred but prior to the Commencement Date Tenant discovers any Hazardous Materials at the Premises (other than encapsulated asbestos in the drywall of the Premises and lead based paint coating certain structural components of the Shopping Center and Premises) which were not introduced by Tenant, its agents, employees or contractors, as Tenant's sole remedy: (a) Tenant may immediately upon written notice to Landlord cease Tenant's work and/or vacate the Premises, and (b) the 151 day period referred to in clause (i) of the definition of Commencement Date herein shall be extended on a day for day basis for each day thereafter until the date Landlord removes such Hazardous Materials and for any additional delay caused to Tenant in performing Tenant's Work as a result thereof;

(3)     Intentionally Omitted;

(4)     all Common Areas have been completed in accordance with all applicable Laws, including, without limitation, all paving of the parking lot, service areas and access roads, curbing (including curb cuts), site lighting, striping, sidewalks, loading dock area and landscaping;

(5)     Tenant has received a fully executed copy of the SNDA required under Section 30(a); and

(6)     Landlord has placed the two existing ceiling mounted forced air unit heaters in good working condition and has installed three additional temporary heaters in the Premises until such time that Tenant installs new HVAC units as part of Tenant's Work.

(g)     Estimated Delivery Date: Landlord's good-faith estimate of the Delivery Date is November 4, 2019. Landlord shall be permitted to extend the Estimated Delivery Date to December 2, 2019 (which shall then become the new Estimated Delivery Date), by delivering written notice of Landlord's election to extend the original Estimated Delivery Date to Tenant before September 1, 2019. If said notice is not delivered by said date, then the Estimated Delivery Date shall remain unchanged.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

(h)     Gross Leasable Area: the number of square feet of floor area (excluding non-retail mezzanine, basement and other such areas), measured from the exterior face of exterior walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment areas used exclusively by Tenant for the Premises.

With respect to the Shopping Center, the Gross Leasable Area is the total constructed Gross Leasable Area available for the exclusive use and occupancy of tenants within the Shopping Center.  With respect to the Premises, the Gross Leasable Area will be the actual completed Gross Leasable Area, as the same exists from time to time.

Any change in Gross Leasable Area, whether of the Premises or Shopping Center, will be deemed in effect on the first day of the next succeeding month following such change.  Landlord covenants to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center due to the construction or demolition of any buildings in the Shopping Center within 60 days of any such change, together with a current Site Plan reflecting such change.

Landlord represents and warrants that the Gross Leasable Area of the Shopping Center intended for exclusive use and occupancy as shown in the Site Plan is 215,000 square feet.

(i)     Hazardous Materials:  See Section 35.

(j)     HVAC:  heating, ventilating and air conditioning exclusively serving the Premises.

(k)     Landlord's Work: the work to be performed by or at the direction of Landlord in constructing and/or remodeling the Premises and related improvements, including those items designated for Landlord set forth on Exhibit C and subject to the terms of Section 10 and Landlord's Approved Plans.

(l)     Laws: any and all laws, codes, ordinances or regulations passed into existence by any Public Entity now or hereinafter in existence.

(m)     Lease Year: a period of 12 consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February next following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date.  The first Lease Year will include the first Partial Lease Year, if any. Rent and any limitations on such Rent for purposes of any Partial Lease Year will be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

(n)  Outside Delivery Date: March 1, 2020 (unless due to Unavoidable Delay in which case the Outside Delivery Date is the date which is the day immediately after the day on which the event or condition causing Unavoidable Delay ceases).

(o)  Partial Lease Year: the period, if any, of fewer than 12 consecutive calendar months between the Commencement Date and the next occurring February 1 and the period, if any, of less than 12 consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

(p)  Permitted Use: the sale of fabrics of all kinds; goods sold by the yard; patterns; knitting supplies, needlepoint, macramé; art materials and supplies; finished crafts, craft materials and supplies; educational aids, materials and supplies; yarns; all types of notions; floral products, artificial flowers and accessories; scrapbooks and scrapbooking supplies and materials; framed artwork; picture frames, framing (both ready-made and custom made) and framing materials and supplies; fabric care items; foam products; ceramics; wearable art and wearable art supplies; miniatures, dolls, hobby items; sewing machines, sewing machine furniture; irons, ironing boards; seasonal merchandise; custom services and custom products using arts and craft and sewing components including, but not limited to quilting, bow-making, window treatments, floral design, fashion sewing, instructional classes, materials and services; and the incidental sale of (defined as no more than 10% of any individual following item) baskets, wicker items; housewares; linens, curtains, towels, pillows; drapery and upholstery materials; draperies, drapery hardware; blinds, shades, shutters and window treatments; do-it yourself products and accessories relating to sewing and crafting; bridal apparel and accessories, wedding supplies; gift items, cards, party supplies; paper goods, stationery; candles, candlesticks, brass and pottery; indoor and outdoor house decorating products and accessories; prepackaged and unpackaged food and food products, coffee, tea and assorted beverages (not to exceed 1,000 square feet); instructional books and tapes; children's books; toys; vacuum cleaners, sewing and crafting lamps; products, accessories related to all of the foregoing, and other items and services customarily offered for sale by a fabric, craft or general merchandise store, and such other related merchandise and services typically offered in the stores operated by Tenant under the name Jo-Ann, Jo-Ann Fabrics and Crafts or such other name under which Tenant may operate in Alaska.

(q)  Premises: a portion of the Shopping Center as shown on the Site Plan and located within the Shopping Center, on the Shopping Center Site, consisting of space having approximately 30,637 square feet of Gross Leasable Area, with a minimum frontage of 150 feet (to the center of the side walls) excluding the area (and any square footage attributable to) referenced in Section 3(c). Tenant will only be required to operate one exterior entrance to the Premises.

(r)  Protected Area: the area shown on the Site Plan.

(s)  Public Entity: the federal, state, county, municipal or other governmental unit,

however denominated, and any agency, division, department or public official thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

(t)     Rent: Fixed Minimum Rent, Additional Rent, and all other monetary obligations of Tenant to Landlord under this Lease.

(u)     Shopping Center: University Center located in Anchorage, Alaska, consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, and outlined on Exhibit B.

(v)     Shopping Center Site: the legal description set forth on Exhibit A, on which the Shopping Center is located.

(w)     Substantially Complete: complete with the exception of minor "punchlist" items that can be completed within 14 days without interfering with the performance of Tenant's Work.

(x)     Substitute Rent: 50% of the Fixed Minimum Rent in lieu of the Fixed Minimum Rent otherwise required to be paid under this Lease.   Tenant remains obligated to pay Additional Rent at any time when Substitute Rent is payable pursuant to any provision of this Lease, except in the case of a Use Violation under Section 14 or a violation of Section 26(a)(9) below, in either of such cases Tenant shall not be obligated to pay any Additional Rent.   In addition, Tenant shall not be obligated to be open or operating the Premises during any period it is entitled to pay Substitute Rent.   Landlord acknowledges that certain violations of this Lease or specified events hereunder will cause Tenant significant damage, but that actual damages will be impossible to determine.  Landlord agrees that the violations and other events specified in the Lease where Tenant is entitled to pay Substitute Rent are in fact cases where Tenant will suffer significant damage, but that actual damages will be impossible to determine.   Landlord has agreed to Substitute Rent as liquidated damages because actual damages are impossible to determine and so liquidated damages represent a fair compromise and is not a penalty. Landlord has agreed to these provisions (and the entire Lease) voluntarily and after consultation with legal counsel.

(y)     Tenant's Proportionate Share: a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center. Notwithstanding the foregoing, if any portion of Common Area Costs, Taxes, or Insurance Costs are furnished or directly payable by an individual tenant or occupant as opposed to Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Common Area Costs, Taxes, or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share shall be adjusted in the event of any increase or decrease in the Gross

Leasable Area of all buildings within the Shopping Center or the Gross Leasable Area of the Premises.

(z)     Tenant's Prototype Plans: the Tenant's Prototype Plans attached hereto as Exhibit D. It is agreed between the parties that, notwithstanding Tenant's Prototype Plans that are attached hereto, Landlord's Approved Plans used to complete Landlord's Work shall be based upon the then-current prototype plans (i.e., plans which are selected in Tenant's sole discretion), and Tenant agrees to reimburse Landlord for any documented, out-of-pocket costs incurred as a result of conforming the Landlord's Approved Plans to the then-current prototype plans as opposed to the Tenant Prototype Plans attached to this Lease).

(aa)    Tenant's Work: the work, if any, to be performed by or at the direction of Tenant in finishing the Premises as provided in Tenant's Approved Plans.

(bb)    Term: the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.

(cc)    Unavoidable Delay: A material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, or an extraordinary and material act of God (such as a tornado or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor.

## SECTION 3. PREMISES

(a)     For the Rent and upon the terms and conditions contained in this Lease, Landlord leases during the Term, and Tenant leases from Landlord during the Term, the following:

(1) The Premises as outlined on the Site Plan and further described herein.

(2) The right, in common with Landlord and all other tenants of the Shopping Center granted similar rights by Landlord, to the non-exclusive use of all Common Areas. The rights hereby granted with respect to the Common Areas shall constitute easements appurtenant to the Premises and a servitude upon the Shopping Center Site. The benefit and the burden of such easements shall run with and bind the Shopping Center Site during the Term.

(3) Subject to local codes and Law, the right to place (i) one storage container ("Container") during seasonal selling seasons in a location at, near, or next to Tenant's loading dock in the Container Area shown on Exhibit B, or at any

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

other location mutually agreed upon by Landlord and Tenant, and (ii) shopping cart corrals ("Corrals") in Tenant's Protected Area in the parking lot and at, near or next to the outside of the Premises' entryway on the sidewalk. Tenant's Corrals shall take up no more than two parking lot spaces, the location of which shall be at a location mutually agreed between Landlord and Tenant in the parking lot (or the immediate vicinity thereof). Each Container will not exceed 10 feet in width and 40 feet in length. Tenant will maintain the Containers and Corrals in good condition and repair. If Landlord receives notice that Tenant's Containers or Corrals violate any local code or ordinance, then after receipt of notice from the governing body, Tenant will remove the violating Containers or Corrals, or move them to an acceptable location. In addition Tenant shall have the right to store up to five bales of cardboard at the exterior of the Premises and each bale has dimensions of approximately 5' x 5'.

(4) Notwithstanding anything contained herein, Tenant has the right to display merchandise on the sidewalk on both sides of the storefront door of the Premises no more than four weeks in each calendar quarter (unless part of a chain wide event), provided that such display does not extend beyond 30 feet in either direction and is at least 10 feet away from any adjacent tenant's premises.

(b)     Subject to the reasonable consent of Tenant, Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (i) are reasonably necessary to serve the Premises or other parts of the Shopping Center, (ii) are installed in locations that will not interfere with Tenant's use of the Premises or Tenant's permitted signage, (iii) are not exposed within the selling area, and (iv) do not decrease the ceiling height of the Premises. Upon the prior consent of Landlord which shall not be unreasonably withheld, Tenant shall have the right to make installations around the Premises (e.g., the roof) which are consistent with Tenant's Prototype Plans for other similar stores operated by Tenant or which are part of Tenant's Leadership in Energy and Environmental Design initiative or other Tenant initiatives.  Upon expiration or termination of this Lease, Tenant shall remove any such installations and promptly repair any penetrations or damage in connection with the installations (or the removal thereof). In exercising the foregoing rights, neither Landlord or Tenant shall interfere with the use or occupancy of the Premises or other tenant premises or commence any such work without first notifying the other party, at least 10 days in advance, of the commencement of such work. In no event may Landlord construct any improvements above the Premises or place signs on the exterior walls of the Premises.

(c)     The "Premises" excludes the exterior walls, roof, and the floor slab (excluding floor covering installed by Tenant) and areas beneath the floor slab, and any mezzanine installed

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

by Tenant in the Premises for the storage of inventory and/or fixtures, and Tenant shall have no obligation to pay rent in connection with the foregoing.

(d) Within 60 days following the Commencement Date, Tenant may have its architect measure the final Premises to determine the Gross Leasable Area of the Premises. If the area reflected by such measurement varies from that set forth in this Lease, then all items of Rent shall be appropriately adjusted, provided, however, that in no event shall any item of Rent be increased by more than 1% because of a variance in area of the Premises and in no event shall the construction allowance be reduced from the amount set forth herein. If no such measurement is performed within such 60 day period, then the area specified in this Lease shall be deemed to be the Gross Leasable Area of the Premises. If Landlord disputes the measurement of Tenant's architect, Landlord shall notify Tenant within five business days after receipt by Landlord of such measurement; if Landlord does not timely object to the measurement by Tenant's architect, Landlord shall be deemed to have approved the measurement by Tenant's architect. If Landlord does timely object, Landlord shall then have 15 days to have an architect selected by Landlord measure the Premises using the procedures set forth herein. If Landlord's architect disputes the findings of Tenant's architect, both architects shall meet in good faith for a period not to exceed 15 days and try to reach agreement on the number of leasable square feet. If the architects cannot reach agreement within such period, the Architects shall in good faith select a third, independent architect (the "Resolution Architect") to measure the Premises. The measurement of the Resolution Architect shall be final and binding on all parties. All fees and costs payable to Landlord's architect shall be paid by Landlord. All fees and costs payable to Tenant's architect, shall be paid by Tenant. Tenant and Landlord shall each be responsible for one-half of the fees and costs payable to the Resolution Architect.

## SECTION 4. TERM AND OPTIONS TO EXTEND

(a) The "Initial Term" begins on the Commencement Date and ends on the last day of the 11th Lease Year, unless sooner terminated as herein provided.

(b) Landlord grants Tenant the right and option to extend this Lease for three additional periods of five years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants and conditions as the Term except for the option to extend then exercised and except for such changes, if any, in Rent or other Tenant charges as are expressly set forth in this Lease.

(c) Tenant must deliver written notice to Landlord of its election to extend this Lease for an Extended Term on or before the later to occur of the following: (1) the date that is 270 days before the expiration of the Term or the Extended Term, as the case may be; or (2) the date that is 30 days after Tenant's receipt of written notice from Landlord indicating that the time period in which Tenant has to exercise its option has expired. Tenant shall have the right to extend for any Extended Term provided Tenant is not in default beyond any applicable notice

and cure period at the time of Tenant's notice as provided in the previous sentence. If the Term expires before such notice from Landlord, and Tenant continues in possession of the Premises after such expiration, the Term will be extended automatically on a month to month basis until 30 days after the date Landlord has given such notice, or Tenant surrenders the Premises to Landlord, or Tenant exercises its option, in which case the Extended Term will be deemed to have commenced upon the expiration of the Initial Term (or prior Extended Term, as the case may be). Concurrently with the exercise of the option by Tenant, Tenant will pay Landlord any unpaid balance of the Rent due during the Extended Term that has accrued as of the date of such notice of extension.

## SECTION 5. FIXED MINIMUM RENT

(a) From and after the Commencement Date, Tenant must pay to Landlord, without demand, at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows:

      (1)    During Lease Years one through five of the Initial Term at the rate of $21.00 per square foot per year; and

      (2)    During Lease Years six through 11 of the Initial Term at the rate of $23.10 per square foot per year; and

      (3)    During the first five-year Extended Term at the rate of $25.41 per square foot per year; and

      (4)    During the second five-year Extended Term at the rate of $27.95 per square foot per year; and

      (5)    During the third five-year Extended Term at the rate of $30.75 per square foot per year.

The amounts shall include and be in payment of all other charges not specifically set forth in this Lease.

(b) Tenant must pay monthly installments of Fixed Minimum Rent in advance on or before the first day of each month during the Term, commencing on the first day of the first month next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord must invoice Tenant, which invoicing will not occur more than 30 days before the Commencement Date, for the first monthly installment of Fixed Minimum Rent. In no event will the first rent installment be due until 10 days after Tenant's receipt of this initial invoice. Fixed Minimum Rent for the partial month, if any, after the Commencement Date will be computed on a per diem basis (assuming a 30-day month), and

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

- 10 -

Tenant must pay the Fixed Minimum Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent (or any portion thereof) on the due date, then the Landlord, in addition to the Rent then owed, is entitled to a late fee equal to 5% of such delinquent amount without need for notice from Landlord; provided such late fee shall be waived the first time Tenant is late in the payment of Rent or other charges in any 12-month period if Tenant pays the full amount due within 10 days after written notice.

(c) Notwithstanding anything contained herein, for the first 18 months of the Term, Tenant may offset from the Rent coming due an amount equal to 50% of the Fixed Minimum Rent otherwise due; provided that Landlord may at any time, upon 30 days prior written notice, pay Tenant the balance of the amount to be offset and thereafter Tenant shall pay the full Rent otherwise due hereunder.

## SECTION 6. PERCENTAGE RENT

(a) In addition to Fixed Minimum Rent, Tenant must pay to Landlord Percentage Rent for each Lease Year and Partial Lease Year equal to 3% of the amount by which Tenant's annual Gross Sales (hereinafter defined) of all goods and services for such Lease Year or Partial Lease Year, if any, exceeds the Breakpoint for such Lease Year or Partial Lease Year. The "Breakpoint" is $7,500,000.00 per year for Lease Years one through five and $8,000,000.00 per year for Lease Year six through 11. The Breakpoint shall increase at and as of the beginning of each Extended Term in direct proportion to the increases in Fixed Minimum Rent.

(b) Notwithstanding anything to the contrary contained in this Lease, for the purpose of calculating Percentage Rent for a Partial Lease Year, the Percentage Rent payable for any such Partial Lease Year shall be calculated using the Gross Sales during the first 12 full calendar months following the Commencement Date (in the case of a Partial Lease Year occurring at the beginning of the Term) and the last twelve full calendar months immediately preceding the expiration date or date of earlier termination of this Lease (Partial Lease Year occurring at the end of the Term.) The Percentage Rent payable for any such Partial Lease Year shall be calculated by multiplying the Percentage Rent due (as otherwise determined pursuant to the provisions of this Lease) for such 12-month period by a fraction, the numerator of which shall be the number of days in the Partial Lease Year and the denominator of which shall be 365.

(c) Percentage Rent for each Lease Year and Partial Lease Year is payable on an annual basis within 75 days after the last day of such Lease Year or Special Computation Period, as the case may be.

(d) Notwithstanding anything to the contrary, if any time Tenant pays Substitute Rent (or Initial Substitute Rent), Tenant shall not be required to pay Percentage Rent pursuant to this Section, during the time Substitute Rent is paid

## SECTION 7. GROSS SALES

(a) "Gross Sales" means the entire amount of the actual receipts, whether cash or otherwise, from all sales of merchandise and services for all business conducted in, on or from the Premises, including: (i) mail or telephone orders received at the Premises and filled from the Premises or elsewhere (but excluding mail, telephone, internet or other orders filled at the Premises but originating elsewhere); and (ii) revenue from gift certificates (whether or not sold at the Premises) when (but only if and when) redeemed at the Premises. Each sale upon installment or credit shall be treated as a sale for the full amount thereof in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers. Layaway sales, so-called, shall be included in the Gross Sales of the respective computation period only to the extent of payments received during that computation period. Notwithstanding the foregoing, with respect to assignees, sublessees, concessionaires and licensees of Tenant that, together, occupy no more than 1,000 square feet of Gross Leasable Area, Tenant shall not be obligated to report and include with Tenant's Gross Sales, the sales generated by them, although any payments to Tenant by such entity will be included in Gross Sales.

(b) Notwithstanding anything to the contrary, the following are excluded from Gross Sales:

 (1) sums collected and paid out for any sales tax or excise tax imposed by any duly constituted governmental authority;

 (2) the value or price of merchandise exchanged between the stores of Tenant, or the affiliates of Tenant, if any, where such exchange of merchandise is made solely for the convenient operation of the business of Tenant or the affiliate of Tenant and not for the purpose of consummating a sale which has been made at, in, from or upon the Premises, or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from or upon the Premises;

 (3) any credit or refund to Tenant in connection with returns by Tenant to shippers or manufacturers

 (4) sales to employees made at a discount;

 (5) non-sufficient funds check charges or financing charges to customers whether or not separately stated or billed;

 (6) service charges to customers who buy a budget or deferred payment plan;

 (7) [Intentionally Omitted];

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

(8)     revenue from vending machines used solely for the benefit of employees;

(9)     the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant;

(10)    sales of fixtures;

(11)    all sums and credits received in settlement of claims for loss or damage to merchandise;

(12)    non-retail bulk sales to liquidators of merchandise outside of the ordinary course of business on the Premises;

(13)    tax exempt sales or merchandise donated or sold at a discount to charitable or non-profit organizations;

(14)    fees for classes or demonstrations;

(15)    the value attributed to merchandise taken in trade;

(16)    referrals to affiliates of or other divisions of Tenant;

(17)    fees for gift wrapping, mailing and other customer services provided on a not for profit basis;

(18)    sales of lottery tickets, special event tickets and the like (but the commissions paid to Tenant shall be included in Gross Sales); and

(19)    the amount of credit sales and credit accounts incurred at the Premises which are written off as bad debts and deducted as an expense; and

(20)    sale of patterns not to exceed 1% of annual Gross Sales.

(c)     The Gross Sales of any Lease Year or Partial Lease Year, as the case may be, and the Percentage Rent due thereon, if any, have no bearing on or connection with the Gross Sales of any other Lease Year or Partial Lease Year.

(d)     Tenant will deliver to Landlord within 75 days after the end of each Lease Year a statement showing Gross Sales for such Lease Year.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

## SECTION 8. TAXES

(a)     Landlord covenants and warrants that the entire Shopping Center is located on tax parcel identification number 003-242-40-000 (the "Tax Parcel"), that the Tax Parcel does not extend beyond the perimeter of the Shopping Center Site and that the improvements comprising the Shopping Center (including the Premises and Common Areas) as set forth on Exhibit B are the only improvements now located thereon which will be considered for the tax value for which Tenant shall be responsible for its Proportionate Share thereof. From and after the Delivery Date, once or twice per Lease Year, depending on when tax bills are issued by the government authority, Tenant must pay to Landlord the Tenant's Proportionate Share of real estate taxes ("Taxes") levied upon the Tax Parcel and paid by Landlord during each year of the Term, after reducing Taxes (i) by the amount of any contributions for Taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center, and (ii) by any rollback, discount for timely or early payment, credit or reduction that has been granted or issued by any taxing authority or governmental group or agency. Notwithstanding the foregoing, if the Premises, or a portion of the Shopping Center including the Premises, is separately assessed, then Tenant will pay, as Tenant's allocable share of Taxes, the lower of: (1) Tenant's Proportionate Share of Taxes, or (2) Tenant's Fraction of Taxes, with Tenant's Fraction being a fraction whose numerator is the Gross Leasable Area of the Premises and whose denominator is the Gross Leasable Area of all buildings within such separately assessed parcel. Tenant will pay Tenant's Proportionate Share of Taxes within 30 days after receipt of Landlord's statement assessing and prorating the Taxes, together with copies of receipted tax bills for which payment is sought and reasonable verification for the computation of Tenant's Proportionate Share. For the first Lease Year, Landlord estimates that Tenant will pay $1.88 per square foot of Gross Leasable Area of the Premises for Taxes; and, Landlord represents that said amount is a good faith estimate of the actual Taxes that would be due if Tenant were paying its full Proportionate Share of Taxes for said Lease Year.

(b)     The parties acknowledge that only Landlord has the right to dispute the assessed value of Shopping Center (which is the only way to attempt to control the real estate taxes).  For this reason, Landlord shall have the duty to timely compare the then current value of the Shopping Center (utilizing the income approach, with a capitalization rate based upon recent sales(s) of comparable shopping centers) to the assessed value of the Shopping Center determined by the taxing authority.  If variance is greater than 5%, Landlord is required to pursue reduction.  Tenant is responsible for its pro-rata share of all costs associated with such pursuit.  If Landlord fails to pursue, payment of taxes will be capped at 5% increase per year until Landlord pursues.

(c)     If any Taxes may be paid in installments, subject to the exclusions below, only the installments coming due during the Term will be included within Taxes. Landlord must use best efforts to minimize the Taxes assessed against the Tax Parcel.

(d)     Tenant must pay before delinquency all municipal, county and state taxes

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.: 2584305v6

- 14 -

assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

(e) Notwithstanding anything to the contrary, the following are excluded from Taxes:

(1) Any portion of the Taxes assessed: (A) against tenant improvements and tenant space completion work, whether constructed by Landlord or by any other party other than Tenant's Work or Landlord's Work; or (B) against additional buildings or other taxable improvements not now constructed on the Tax Parcel; or (C) otherwise attributable to any increase in the assessed value of the Tax Parcel by reason of such improvements or work;

(2) Any portion of the Taxes attributable to a revaluation of the Tax Parcel arising out of a sale or other change in the ownership thereof or of any interest therein;

(3) Any portion of the Taxes in the nature of fees, charges or assessments for governmental services or improvements related to the initial construction or any alteration, expansion or rehabilitation of the Shopping Center or other improvement of the Tax Parcel (beyond the upkeep and repair of the Shopping Center that is necessary to keep the same in first-class condition);

(4) Any tax or fee that applies generally to all business owners or operators, as opposed to owners of real property;

(5) Any impact fee, user fee, exaction fee, environmental fee or other tax paid as a prerequisite to construction of the Shopping Center, or any addition or improvement thereto;

(6) Estate tax, inheritance tax, succession tax, capital levy tax, corporate franchise tax, margin tax, rent tax, profits tax, gross receipts tax, income tax, conveyance fee or transfer tax and the like;

(7) Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of the Shopping Center, or (B) used to fund construction of additions or improvements to the Shopping Center; and

(8) Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

## SECTION 9. COMMON AREA COSTS

(a) In addition to payment of the Fixed Minimum Rent, Tenant must pay to Landlord Tenant's Proportionate Share of Landlord's reasonable and actual costs applicable to the Shopping Center for the operation and maintenance of the Common Areas ("Common Area Costs"), after reducing such Common Area Costs by (i) the amount of any contributions toward Common Area Costs paid by tenants paying such costs directly to a third-party provider or any party not a tenant of the Shopping Center; and (ii) all fees and revenue collected or paid to Landlord for parking in, at, on, near or around the Shopping Center (if any). Subject to the cap in Section 49, Tenant must pay to Landlord in 12 equal installments, each in advance on the first day of every calendar month, an estimated sum toward Tenant's Proportionate Share of Common Area Costs. During the first Lease Year, the actual amount paid by Tenant will not exceed the rate of $0.75 per year multiplied by the Gross Leasable Area of the Premises. For Lease Years after the first Lease Year, the monthly sum may be adjusted annually by Landlord to reflect actual changes in the Common Area Costs, subject to the cap in subsection (c) below.

(b) On or before April 1 of each year, Landlord must provide Tenant with a statement assessing and prorating the Common Area Costs, together with a certified statement of the Gross Leasable Area of the Shopping Center and copies of all bills for which payment is sought. If Landlord fails to provide the annual reconciliation statement, then Tenant has the right to suspend payment of Common Area Costs until such statement is received. Tenant must pay to Landlord, within 30 days of such receipt, any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess will be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within 30 days after delivery of the annual statement.

(c) Notwithstanding the anything to the contrary, in no event will Tenant's Proportionate Share of Common Area Costs (excluding snow removal costs and Common Area utilities) increase by more than 5% per year (non-cumulative basis) above that amount actually paid by Tenant for the previous Lease Year.

(d) Tenant and its agent have the right to audit and inspect Landlord's books and records pertaining to Common Area Costs, Taxes and Insurance Costs, at any time upon 15 days written notice. If any audit or review of Landlord's books and records determines that Tenant has overpaid or underpaid any Common Area Costs, Taxes or Insurance Costs, then Tenant has the right to offset any overpayment against Rent and Tenant shall pay the total amount of such underpayment with the next payment of Rent after completion of the audit, but if Tenant is in the last Lease Year of the Term, then Landlord must refund the overpayment to Tenant within 30 days after notice from Tenant. If any such audit or review determines that Tenant has overpaid any Common Area Costs, Taxes or Insurance by more than 5%, then Landlord must pay to Tenant the reasonable cost of such audit or review; otherwise the audit or review shall be at Tenant's sole cost and expense and Tenant must pay to Landlord the reasonable cost of such

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

- 16 -

Exhibit A
Page 19 of **EXHIBIT A**

Case 3:20-cv-00272-JMK   Document 1-1   Filed 10/26/20   Page 27 of 88 **Page 27 of 88**

audit or review. Landlord shall be responsible for providing Tenant with books and records for Tenant's additional rent contribution for the preceding calendar year and such additional periods required under this Lease.

(e)     The payment of such Common Area Costs is in consideration of Landlord's maintenance and operation of the Common Areas, and Landlord must use such payment for that purpose.

(f)     Notwithstanding anything to the contrary, the following are excluded from Common Area Costs:

(1)     the original cost, or depreciation of the original cost, of constructing, erecting and installing the Shopping Center, the Common Areas, common facilities and related services;

(2)     principal and interest payments pursuant to any mortgage that encumbers the Premises or Shopping Center;

(3)     Taxes;

(4)     administrative charges, management fees, fees based upon a percentage calculation, leasing commissions or any other fee or charge regardless of the name (including, without limitation, salaries of all kinds, social security, taxes, insurance, part-time or full-time labor, any fees paid to manage the Shopping Center including those paid to a third party management company, and similar costs and expenses) that is related to the management and operation of the Shopping Center, except for the Fixed Management Fee which may be included in Common Area Costs (the "Fixed Management Fee" equals $0.45 per square foot per year for Lease Years one through five, $0.55 per square foot per year for Lease Years six through 11, and shall increase at and as of the beginning of each Extended Term by $0.15 per square foot per year, for example during the first Extended Term the fee equals $0.70 for each Lease Year of the first Extended Term);

(5)     expenses incurred due to the negligence or willful misconduct of Landlord or any occupant of the Shopping Center or their respective agents or employees;

(6)     costs and expenses incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects;

(7)     expenses related to an individual occupants of the Shopping Center or to a

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

- 17 -

Exhibit A
Page 20 of 89 EXHIBIT A

Case 3:20-cv-00272-JMK   Document 1-1   Filed 10/26/20   Page 28 of 88 Page 28 of 88

particular tenant space, or to buildings;

(8)    any cost, fees, fines or penalties, or interest thereon, related to violations by Landlord or any occupant of any Law; and the cost of compliance with Laws enacted after the date hereof;

(9)    capital expenditures (a capital expenditure is defined as an item or items costing $1,000 or more and having a useful life of at least one year); other than Tenant's Proportionate Share of any "Permitted Capital Expenditure." A Permitted Capital Expenditure is limited to the following: repaving of the parking lot(s) not more frequently than once every 10 years; provided, however, that each Permitted Capital Expenditure must be amortized on a straight-line basis over the useful life of the related improvement based on federal income tax guidelines, but in no event less than five years, and only the amount of the annual amortization shall be included in Common Area Costs for any Lease Year within the useful life so determined;

(10)   reserves for replacement;

(11)   costs for insuring the Common Areas, but this exclusion does not limit Landlord's rights of reimbursement, if any, under Section 21;

(12)   cost of advertising, marketing, decorating, redecorating, or special cleaning or other services not provided on a regular basis;

(13)   all costs and expenses relative to the solicitation and execution of leases for space in the Shopping Center;

(14)   all costs and expenses related to the operation, maintenance and repair of any garage space in the Shopping Center;

(15)   the cost of any repair or replacement made by Landlord because of the total or partial destruction of the Shopping Center or the condemnation of a portion of the Shopping Center or the Shopping Center Site;

(16)   any operating expense paid to a related corporation, entity or person that is in excess of that amount that would have been paid absent such relationship;

(17)   the cost of overtime or other expenses incurred by or on behalf of Landlord to correct any default of Landlord or for work performed by or on behalf of Landlord where such work is expressly provided in this Lease

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

or any other lease the cost of which was/is to be borne at Landlord's expense;

(18)    any cost that is paid or reimbursed by third parties, including warranties and guarantees and including any cost that is paid or reimbursed by insurance (or would have been covered by insurance required to be maintained by Landlord);

(19)    the amount of any insurance deductible or self-insured retentions;

(20)    payments made under any easement, operating agreement, license, restrictive covenant, or any instrument relating to the payment or sharing of costs among property owners;

(21)    costs disproportionately incurred by or on behalf of one or more tenants, including, without limitation, all costs relating to a food court area; and

(22)    costs and expenses incurred with respect to the correction, disposal, investigation, removal, transportation, or treatment of Hazardous Material.

(g)    Landlord must use best efforts to keep Common Area Costs to a minimum subject, however, to the obligation of Landlord to maintain the Shopping Center as a first-class retail project.

(h)    Landlord covenants that there will be no duplication of costs between those payable by Tenant within this section and under this section and any other section of this Lease.

**SECTION 10.    CONSTRUCTION OF PREMISES**

(a)    On or before the date that is 90 days before the Estimated Delivery Date (the "Plans Delivery Date"), Landlord must prepare and submit to Tenant for Tenant's approval proposed plans and specifications regarding Landlord's Work (the "Landlord's Proposed Plans"), which Landlord Proposed Plans will include the items set forth in Exhibit C for Landlord completion and conform to Tenant's Prototype Plans, subject to such changes as may be required by law or which are reasonable given the unique conditions of the Premises.    If Landlord's Proposed Plans are not delivered to Tenant by the Plans Delivery Date, then for each day past the Plans Delivery Date that the plans are not delivered, the Commencement Date shall be delayed on a day-for-day basis until Landlord's Proposed Plans are delivered to Tenant.    If Tenant fails to approve or disapprove, in writing, the Landlord's Proposed Plans within 15 days after receipt thereof from Landlord, then such approval will be deemed to have been granted.    If Tenant furnishes Landlord a written response, Landlord agrees to resubmit revised Landlord's Proposed Plans within 10 days after having received Tenant's response and Tenant will then have a 10-day period within which to review the same.    If Tenant fails to respond within said 10

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

- 19 -

Exhibit A
Page 22 of 88 **EXHIBIT A**
Case 3:20-cv-00272-JMK    Document 1-1    Filed 10/26/20    Page 30 of 88 **Page 30 of 88**

days, then such revision will be deemed approved. Such review process will continue, with each party exercising good faith, until the Landlord's Proposed Plans are acceptable to both Landlord and Tenant (said approved Landlord's Proposed Plans shall be referred to as the "Landlord's Approved Plans"). If the parties do not reach agreement on Landlord's Approved Plans within 90 days after their first submission to Landlord, despite good faith efforts by Landlord and Tenant, Tenant may terminate this Lease upon written notice to the Landlord within 15 days after such 90-day period.

(b)    Landlord must perform Landlord's Work shown on Landlord's Approved Plans in accordance with Landlord's Approved Plans and Exhibit C, and any items designated for completion by Landlord on Exhibit C, at no cost to Tenant, in accordance with the terms of this Lease, the project coordination guidelines (Exhibit E), and in accordance with all Laws. Landlord will, at Landlord's sole cost and expense, apply for and receive from the appropriate Public Entity the temporary certificate of occupancy (or equivalent). Landlord or Landlord's agent shall coordinate and be responsible for the installation of access for telephone service, which "installation" shall include (i) conduit installation with pull string from the local telephone company's main point of entrance to the Premises, (ii) installation of a plywood board allowing termination of service by the local phone company within the Premises, and (iii) installation of #6 ground rod. The installation access for telephone service must be complete on the date that is 90 days prior to the Delivery Date and Landlord shall notify Tenant of such completion (it being agreed and understood that, at Tenant's option, the Delivery Date may be delayed on a day-for-day basis for each day the installation of the telephone service remains incomplete after said date.) Landlord must deliver to Tenant the Premises no later than the Estimated Delivery Date in compliance with all Laws.

(c)    Within 30 days after approval of Landlord's Approved Plans, Tenant, at its sole cost and expense, must deliver to Landlord for Landlord's approval, a copy of Tenant's proposed plans and specifications and Sign Drawings (the "Tenant's Proposed Plans"), which can be completed only after completion of Landlord's Approved Plans. Landlord shall not in any event withhold its approval of any plans and specifications to the extent they comply with Tenant's Prototype Plans attached hereto as Exhibit D. If Landlord fails to approve or disapprove, in writing, the Tenant's Proposed Plans within 15 days after receipt thereof from Tenant, then such approval will be deemed to have been given. If Landlord furnishes Tenant a written response, Tenant will resubmit revised Tenant's Proposed Plans within 10 days after having received Landlord's response, and Landlord will then have a 10-day period within which to review the same. If Landlord fails to respond within 10 days, then such revision will be deemed approved. Such review process will continue until the Tenant's Proposed Plans are acceptable to both Landlord and Tenant (said approved Tenant's Proposed Plans shall be referred to as the "Tenant's Approved Plans"), whereupon the same will constitute the Tenant's Approved Plans. In no event shall Landlord object to any part of Tenant's Proposed Plans to the extent it is consistent with Tenant's Prototype Plans. Within 15 days of Tenant's receipt of Tenant's Approved Plans, Tenant shall apply for all required governmental permits and approvals necessary for Tenant's Work, and Tenant shall diligently pursue obtaining such

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

permits and approvals. If Tenant is unable to secure the required governmental permits and approvals within 60 days of Tenant's application therefore ("Permit Period") despite good faith efforts, then Landlord shall have the right to pursue such permits and approvals on behalf of Tenant for an additional 60 days (said 120 day period is hereinafter referred to as the "Permit Period"). If the required governmental permits and approvals have not been obtained during the Permit Period, despite good faith efforts by Tenant, Tenant shall have the right to terminate this Lease by delivering written notice to Landlord of its intent to terminate the Lease to the Landlord within 30 days after the end of the Permit Period. If Tenant fails to exercise its right to terminate this Lease during said 30 day period, the right to terminate established under this section shall be null and void. After delivery of the termination notice to Landlord, Tenant shall be relieved of all obligations under this Lease and shall not be liable to Landlord for damages or otherwise.

(d)     Tenant shall hereafter have access to the Premises for inspection, taking measurements, making plans, erecting temporary or permanent signs and the performance of Tenant's Work as may be appropriate or desirable by Tenant without being deemed thereby to have taken possession or accepted delivery of the Premises; provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify, defend and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees or contractors. In no event will Tenant be required to accept delivery of the Premises unless and until all the Delivery Requirements have been satisfied. No agent or non-employee representative of Tenant has the authority to accept delivery of the Premises. Only direct employees of Tenant with a title of Director or above can accept delivery, which acceptance must be in writing. Any purported acceptance by a non-authorized person or that is not in writing is not binding upon Tenant.

(e)     The Delivery Requirements must be satisfied on or before the Estimated Delivery Date. If any punchlist items (hereinafter defined) remain to be completed on the Delivery Date, then Tenant may, at its sole option, accept delivery of the Premises by written acknowledgment as required under this Lease and Landlord shall complete the same as promptly as possible (and in any event within 15 days after the Delivery Date) without interfering with the performance of Tenant's Work. If Tenant has accepted delivery of the Premises with punchlist items not completed and if any punchlist items are not 100% completed within such 15-day period, then (i) it shall be deemed that delivery of the Premises has not occurred and all liquidated damages set forth in the following subsection of this Lease shall be retroactive to and calculated from the Estimated Delivery Date and continue through to the date that all punchlist items are 100% complete (whether completed by Landlord or Tenant, as set forth below), and Tenant has accepted delivery of the Premises, and (ii) Tenant may, without obligation to do so, complete the punchlist items, and Landlord shall reimburse Tenant for the cost thereof upon demand. Upon completion of the punchlist items by either Landlord or Tenant, as the case may be, Landlord may offer the Premises to Tenant for delivery. If the Delivery Date has not occurred on or before the Outside Delivery Date, Tenant will have the right, but shall not be obligated, to

accept delivery of the Premises, without relieving Landlord of any obligation to complete Landlord's Work and otherwise to satisfy the Delivery Requirements. "Punchlist items" shall mean such minor items of fit or finish which do not affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises, as determined in Tenant's sole discretion.

(f)    If the Delivery Date does not occur by the Estimated Delivery Date for any reason other than Unavoidable Delay or a Review Delay, Landlord must pay Tenant $25,000.00 (the "Lump Sum Payment"). In addition, Landlord must pay Tenant $1,000.00 for each day (the "Per Diem Payment") between the Estimated Delivery Date and the earlier to occur of (i) the Delivery Date or (ii) the date Tenant terminates this Lease in accordance with Section 10(g). If Landlord fails to pay Tenant the Lump Sum Payment and/or the Per Diem Payment, then Tenant will have the right (without limiting any other right or remedy of Tenant to collect such payment) to deduct such amount, together with interest thereon at the Default Rate, from Rent. Landlord and Tenant agree that it will be difficult to determine the precise amount of damages that Tenant will incur as a result of the failure of the Delivery Date to occur by the Estimated Delivery Date. Therefore, Landlord and Tenant agree that the Per Diem Payment and the Lump Sum Payment constitute liquidated damages for such failure. If the Delivery Date does not occur by the Estimated Delivery Date, said liquidated damages shall be payable to Tenant irrespective of the date Tenant actually opens for and conducts business in the Premises and shall be payable to Tenant irrespective of whether Tenant enters or accepts the Premises before the completion of Landlord's Work. As used herein, "Review Delay" means any delay due to Landlord's failure to obtain so called "Big Box Review Approval" provided Landlord diligently pursues same in good faith and in no event shall a Review Delay extend the time for which Landlord is obligated to pay the Lump Sum Payment or Per Diem Payment more than 90 days.

(g)    If the Delivery Date has not occurred on or before the Outside Delivery Date, then Tenant has the right to terminate this Lease by delivering written notice to Landlord at any time from and after the Outside Delivery Date but before the occurrence of the Delivery Date. After delivery of Tenant's notice of termination, Tenant shall be relieved of all obligations and liability hereunder. If Tenant so terminates this Lease, Landlord shall be liable to Tenant for all payments due Tenant under Section 10. In addition, Landlord within 20 days must reimburse Tenant for all attorney's fees (not to exceed $7,500.00) and architectural costs (not to exceed $40,000.00) incurred by Tenant in connection with this Lease. This Section 10(g) survives the termination of this Lease.

(h)    Landlord must pay Tenant a "construction allowance" in the amount of $307,000.00, irrespective of costs or the size of the Premises within 30 days of the date Tenant opens for business in the Premises. If Landlord fails to pay Tenant any portion of the construction allowance in accordance with this Lease, then Tenant will have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Rent (as a setoff or as recoupment in the case of bankruptcy), together with interest thereon at the Default Rate. Landlord will wire-transfer the construction allowance to Tenant's bank as follows: Bank of

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

America, 100 West 33rd Street, New York, NY 10001, ABA: 026009593 (in the event Landlord elects to submit an ACH transmission, the number is: 111000012); Jo-Ann Account No.: 4427216208; Account Name: Jo-Ann Stores, LLC Store #2545.

## SECTION 11.  USE

(a)    The Premises may be used for the Permitted Use and, except as provided otherwise in this Section 11 and subject to the prior consent of Landlord not to be unreasonably withheld, for any other lawful retail use.

(b)    Subject always to the right to use the Premises for the Permitted Use, the Premises will not be used in violation of the exclusive uses as are set forth on Exhibit F or any Prohibited Use (as set forth in Section 26(a)(9)). Landlord represents that Exhibit F accurately reflects the exclusive uses that presently encumber the Premises.

## SECTION 12.  COMMON AREAS

(a)    Landlord, at its own cost and expense (except as otherwise specified in Section 9 or Section 21) must construct, install, operate, manage, repair and maintain the Common Areas in a first-class, neat and clean condition for the benefit of Tenant and Tenant's customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas include, but are not limited to:

(1) Equipping and lighting the Common Areas;

(2) Maintaining the surfaces of all sidewalks, restriping and maintenance of paved and parking areas in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality to the original;

(3) Reasonably removing ice and snow to the extent reasonably needed for passage of customers, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the Common Areas to keep them in a clean and orderly condition;

(4) Placing, keeping in good condition and repair and replacing all utility lines, any necessary appropriate directional signs, markers and curbs;

(5) Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary;

(6) security arrangements or similar services and functions.

(b)    Landlord may close any Common Areas temporarily, at such times as to cause

the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking. In no event shall Landlord designate the Protected Area as an employee parking area.

(c)     Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas, driveways and sidewalks as promptly as possible. Landlord cannot impose any parking charges for the parking of automobiles in the parking areas. Landlord cannot grant any rights in, or permit special or exclusive use of, the sidewalk space or parking areas near the front of the Premises or in the exterior area near the rear door of the Premises.

## SECTION 13.  UTILITIES

Landlord, at its sole cost and expense, must cause all utilities furnished to the Premises to be separately metered so that only the service provided to the Premises will be reflected in utility bills rendered to Tenant by the respective supplying public utility companies. Tenant must pay, when due, bills for utilities furnished to the Premises by public utility companies from and after the Delivery Date, including water, gas, electricity and telephone and the like, as are separately metered and charged directly to Tenant.

## SECTION 14.  USE VIOLATION

(a)     Landlord shall not lease, license or sell any space in the Shopping Center to a direct category competitor of Tenant, which is a fabric store, arts and crafts store or sewing machine store ("Protected Use"), such as by way of example and not limited to Michael's Arts & Crafts, AC Moore, Sierra Pacific Crafts, Ben Franklin Arts & Crafts, Beverly's, Hancock Fabrics, Calico Corners, Hobby Lobby,  Archivers, Recollections, Aaron Brothers custom framing, Singer, Bernina, Viking White, Husqvarna and Pfaff. If any portion of the Shopping Center is used or occupied by such a direct category competitor (a "Use Violation"), then Tenant shall have the right to pay Substitute Rent until such Use Violation ceases. In addition, during the time that any Use Violation exists, Tenant has the right to terminate this Lease by giving 60 days written notice to Landlord, in which event all further obligations hereunder shall terminate on the date specified in Tenant's notice, and any Rent (including Substitute Rent) paid in advance by Tenant must be refunded to Tenant within 30 days after termination of the Lease.

(b)     In the event that Tenant's Protected Use is violated, the computation of Substitute Rent shall commence on the first day of the violation of the Use Violation, and shall be paid in monthly installments.

(c)     Notwithstanding anything to the contrary, in the event of a Use Violation by any tenant or occupant who conducts or operates in violation of the Protected Use without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then Tenant's right to pay Substitute Rent and terminate this Lease will be deferred, provided that

Landlord commences court action to cure or eliminate the Use Violation by the rogue tenant within 30 days of it first occurrence and diligently pursues same to completion (which diligence by Landlord must include appeals to the highest state court, if lower court rulings are adverse to Landlord and allow the Use Violation to continue). If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then Tenant may exercise its termination right and right to pay Substitute Rent at any time.

(d)     Tenant's failure to exercise the termination option is not a waiver of Tenant's continuing right to do so as long as such Use Violation continues.  Without limiting Tenant's rights and remedies under this Section 14, Tenant has the right to equitable relief (including injunction) in the event of a Use Violation.

(e)     Landlord covenants and agrees to use diligent, good faith, commercially reasonable efforts to cure any breach or violation of this Section, including, without limitation, seeking and diligently prosecuting all available legal and equitable remedies to compel or otherwise cause cessation of the Use Violation.

## SECTION 15.  CO-TENANCY

(a)     Opening Co-Tenancy.

(i)     The Opening Co-Tenancy Requirement means that both La-Z-Boy and Sadler's Furniture (the "Anchor Tenants") are open for business to the public during normal operating hours from substantially all the premises as shown on the Site Plan (the "Anchor Tenant Premises"). Notwithstanding anything to the contrary, Tenant is not required to open for business, nor is Tenant obligated for the payment of Rent, until the Opening Co-Tenancy Requirement is met.

(ii)     If Tenant elects to open for business before the date that the Opening Co-Tenancy Requirement is met, then from the date Tenant opens for business until the Opening Co-Tenancy Requirement is met, Tenant may pay Substitute Rent.

(iii)     If the Opening Co-Tenancy Requirement is not met for 12 months from the date the Commencement Date would otherwise have occurred, then Tenant has the right and option to terminate this Lease by giving 90 days prior written notice to Landlord within the next 180 days after the 12-month period. If Tenant fails to terminate this Lease within such time, Tenant shall thereupon be required to pay the full Rent due hereunder.

(b)     Ongoing Co-Tenancy.

(i)     The Ongoing Co-Tenancy Requirement means that at least one Anchor Tenant is open for business to the public during normal operating hours from substantially all its Anchor Tenant Premises.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.: 2584305v6

(ii)    If, at any time after the satisfaction of the Opening Co-Tenancy Requirement or the period during which Tenant has the right to terminate this Lease on account of a failure thereof, whichever is later, the Ongoing Co-Tenancy Requirement is not met for a period of 30 days, then Tenant may pay Initial Substitute Rent until the Ongoing Co-Tenancy Requirement is satisfied. If the Ongoing Co-Tenancy requirement is not met within 12 months after the expiration of the 30-day period, then without limiting Tenant's right to pay Initial Substitute Rent, Tenant may terminate this Lease upon 30 days written notice to Landlord delivered at any time thereafter prior to the date the Ongoing Co-Tenancy Requirement is satisfied. If the Ongoing Co-Tenancy requirement is not met within 18 months, then without limiting Tenant's right to terminate this Lease, Tenant may thereafter pay Substitute Rent for up to 18 months thereafter prior to the date the Ongoing Co-Tenancy Requirement is satisfied. If Tenant fails to terminate this Lease within such 18 month period, Tenant shall thereupon be required to pay the full Rent due hereunder.

(c)    Definitions.

(i)    A single national, or regional comparable retail tenant suitable for occupancy in a first-class shopping center (including any retail subsidiary of Landlord) and operating under one trade name in 75% of the either portion of the Anchor Tenant Premises, will be deemed to be an "Anchor Tenant" after the commencement of such substitute operation, except that holiday, seasonal and other temporary tenants that occupy the Anchor Tenant Premises for less than 180 consecutive days will not be deemed an Anchor Tenant.

(ii)    For purposes of this Lease, "regional" shall mean a first-class retailer operating at least four stores in Alaska or the Pacific Northwest (including Washington, Oregon, Idaho and Montana).

(iii)    A "Retail Tenant" is a non-residential, non-office tenant, under a lease with a term of at least five years who sells goods to consumers, provided that any tenant that has office space within its premises incidental to a retail use shall still be considered a Retail Tenant. For clarification purposes only, restaurants and salons shall be considered Retail Tenants. Real estate or securities brokerage offices, financial or tax planning services, accounting offices, insurance or legal services, travel agencies, banks, health clubs, cinemas, bowling alleys, comedy clubs, medical offices, and dental offices shall not be considered Retail Tenants.

(iv)    "Initial Substitute Rent" means 65% of the Fixed Minimum Rent in lieu of the Fixed Minimum Rent otherwise required to be paid under this Lease, provided however that Tenant is obligated to pay 50% of Additional Rent at any time when Initial Substitute Rent is payable pursuant to this Section 15. In addition, Tenant shall not be obligated to be open or operating the Premises during any period it is entitled to pay Initial Substitute Rent.

## SECTION 16.  RULES AND REGULATIONS

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

(a)    Landlord may, for the general welfare of the Shopping Center or the avoidance of nuisance, impose reasonable rules and regulations of general application governing the conduct of tenants in the Shopping Center and the use of the Common Areas (it is agreed and understood that such rules and regulations and any subsequent modifications thereto, notwithstanding anything to the contrary in this Lease, shall be subject and subordinate to the terms and conditions of the body of this Lease so that in the event of any conflict or inconsistency between the terms hereof and such rules and regulations, the terms hereof shall supersede and control.)  Tenant will comply with and perform any and all such rules and regulations imposed by Landlord so long as such rules and regulations do not limit the rights or expand the obligations of Tenant under this Lease and all occupants of the Shopping Center are subject to and comply with such rules and regulations.  Landlord must use best efforts to enforce such rules and regulations.

(b)    Tenant is not required to join or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor is Tenant required to pay any of the costs of the activities conducted by such association.

## SECTION 17.  ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT

(a)    Tenant, without Landlord's consent, has the right to make such interior alterations, changes and improvements to the Premises as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the Premises; except for structural changes, alterations or improvements, which require Landlord's consent, which consent must not be unreasonably withheld or delayed.  Tenant will pay all costs and expenses of its improvements, will make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all applicable laws and building regulations, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements.

(b)    Except as otherwise provided, all signs, furnishings, trade fixtures, inventory, equipment and other removable property installed in the Premises by Tenant will remain the personal property of Tenant, will not be subject to any Landlord's lien or lien or security interest against the property of Landlord, and may be removed from the Premises by Tenant upon the termination of this Lease. If any of the foregoing is affixed to the Premises, Tenant will repair any damage caused by removal.

## SECTION 18.  REPAIRS AND MAINTENANCE

(a)    Except as otherwise provided, Tenant will maintain the interior, non-structural portion of the Premises, at its sole cost and expense, in an attractive, clean and sanitary condition.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

(b)     Landlord warrants and guarantees that all structural portions of the Premises and the roof, utility cables, mains and conduits, electrical, gas, plumbing, sprinkler, and sewer systems are, and will be upon the Delivery Date, in good working order and repair, and that the Premises and Common Areas surrounding the Premises are water tight (for example, there is no standing water outside or inside of the Premises), and there are not, and will not be on the Delivery Date, any violations of any Laws.  Landlord, at no cost to Tenant, must promptly correct any code violations subsequently found to exist and promptly replace or repair, in a good and workmanlike manner and using the highest quality materials, any defects in workmanship, material or equipment that may appear in, on or about Landlord's Work during the Term.

(c)     Subject to Section 18(d), and except for damage caused by fire or other casualties or taking by eminent domain or conveyance in lieu thereof: Tenant, at its sole cost and expense, must make all interior nonstructural repairs to the Premises, including doors and windows, and (1) all repairs to the plumbing and gas systems exclusively serving the Premises from their respective meters to and including the plumbing and gas systems in the interior of the Premises, and (2) the electrical system exclusively serving the Premises from Tenant's electrical panel to and including the electrical systems in the remainder of the interior of the Premises. Notwithstanding the foregoing, Tenant is not required to make any: (i) repairs of damage covered by insurance maintained or required to be maintained by Landlord; (ii) repairs necessitated by reason of the negligence, willful misconduct, or default of Landlord, its agents, employees or contractors; (iii) repairs to the plumbing, gas, electrical or other similar units and systems where such repairs would necessitate going through or into the floor slab, structural walls, or roof of the Premises; (iv) replacement of any plumbing, gas, electrical or similar units or systems; or (v) repair or replacement of the sprinkler, life safety or other detection or suppression systems except to the extent such systems are installed as part of Tenant's Work, in which case Tenant shall be solely responsible any such repairs or replacement system.  All of the repairs and replacements referred to in the immediately preceding sentence will be performed by Landlord at its sole cost and expense.

(d)     Landlord, at its sole cost and expense, must make all repairs to the Premises other than those that Tenant is required to make.  Landlord's obligations include, but are not limited to, repairs to the structural portions of the Premises (both interior and exterior), the roof, floor slab, foundation, exterior walls, any interior damage caused by roof leaks or water/sewage backing up into the Premises from the Common Areas or other tenant spaces, and all repairs or replacements to the (x) gas and plumbing systems or any portion thereof up to (but not including) their respective meters, and (y) the electrical system up to (but not including) Tenant's electrical panel.  In making any repairs or replacements, Landlord must not unreasonably interfere with Tenant's normal operations and business.  Landlord assigns to Tenant all warranties and guarantees, if any, with respect to any and all construction and equipment on the Premises to be maintained by Tenant.

(e)     Tenant will be responsible, at its sole cost and expense, for installation of new

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.:  2584305v6

HVAC units, system and component parts thereof as part of Tenant's Work. Tenant will be responsible for all repairs and replacements of the HVAC unit(s) and system and any part thereof. Notwithstanding anything to the contrary in the Lease, if Tenant should replace or repair the HVAC system or any part thereof during the final two years of the Initial Term or any Lease extension or renewal, if any, and not remain in possession of the Premises pursuant to a subsequent Lease extension or renewal, then the Landlord shall reimburse Tenant, within 30 days of the deliver back of possession of the Premises to the Landlord, for (i) the un-amortized cost of said replacement based on a straight-line amortization schedule over the useful life of the equipment in accordance with federal income tax guidelines (in no event less than 15 years), or (ii) the actual cost of the repair in excess of $1,500.00 (it being understood that Tenant shall be responsible for the first $1,500.00 of cost of any such repair), as the case may be.

(f)     Tenant will maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash and place such rubbish, garbage and trash in the containers provided by Tenant. Tenant, at its own cost and expense, will dispose of all rubbish, garbage and trash on a timely basis. Landlord will provide an area for Tenant's trash compactor or containers, at Landlord's sole cost and expense, within 20 feet of the rear of the back door to the Premises.

(g)     Subject to this Section 18, Tenant will keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests, and Landlord must keep the Common Areas in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests. Notwithstanding the foregoing, Landlord is responsible for the extermination of termites, carpenter ants, and other insects capable of causing structural damage in, on or about the Premises, the Common Areas, and all parts of the Shopping Center. Landlord must require all tenants of the Shopping Center to keep their spaces in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests.

(h)     Tenant is responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public Entity after the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease (including Section 18(c) above).     Landlord is responsible, at its sole cost and expense, for making all alterations of or improvements to the Premises that are required by any Public Entity (which requirement may arise as a result of Tenant seeking approval from a Public Entity for alterations and improvements to the Premises) and that (i) are structural in nature, (ii) relate to the exterior thereof, including the Common Areas, (iii) relate to the sprinkler, utility or life safety systems therein or (iv) relate to the handicapped or disabled, but this clause (iv) does not require Landlord to make any "path of travel" alterations or improvements or those otherwise relating to Tenant's fixtures and placement thereof.

(i)     Landlord and Tenant acknowledge that responsibility for compliance with the terms and conditions of Title III of the Americans with Disabilities Act ("ADA") may be allocated between Landlord and Tenant. Notwithstanding anything to the contrary contained in the Lease, Landlord and Tenant agree that the responsibility for compliance with the ADA shall

be allocated as follows: (i) Tenant shall be responsible for compliance with the provisions of Title III of the ADA with respect to the construction by Tenant of Tenant's Work, if any, and Tenant's alterations within the Premises, (ii) Landlord shall be responsible for compliance with the provisions of Title III of the ADA in providing all of Landlord's Work required under this Lease, if any, and with respect to any structural matters within the Premises and (iii) Landlord shall be responsible for compliance with the provisions of Title III of the ADA with respect to the parking areas, sidewalks and walkways, together with all other Common Areas of the Shopping Center not included within the Premises and not otherwise part of Tenant's Work or Tenant's alterations within the Premises. Landlord and Tenant each agree to indemnify and hold each other harmless from and against any claims, damages, costs, and liabilities arising out of Landlord's or Tenant's failure, or alleged failure, as the case may be, to comply with Title III of the ADA as set forth above, which indemnification obligation shall survive the expiration or termination of the Lease. Landlord and Tenant each agree that the allocation of responsibility for ADA compliance shall not require Landlord or Tenant to supervise, monitor, or otherwise review the compliance activities of the other with respect to its assumed responsibilities for ADA compliance as set forth herein. The allocation of responsibility for ADA compliance between Landlord and Tenant, and the obligations of Landlord and Tenant established by such allocations, shall supersede any other provisions of the Lease that may contradict or otherwise differ from the requirements of this section.

## SECTION 19.  INDEMNIFICATION

(a)    Subject to Section 20, Landlord must indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with the loss, damage or injury to persons or property, arising out of or related to: (i) the negligence or willful misconduct of the Landlord, Landlord's agents, contractors or employees, (ii) the breach by Landlord of  this Lease; or (iii) the use or operation of the Common Areas and all other space in the Shopping Center not designated for the exclusive use of one tenant.

(b)    Subject to Section 20, Tenant must indemnify, defend and hold Landlord harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with the loss, damage or injury to persons or property, arising out of or related to: (i) the negligence or willful misconduct of the Tenant, Tenant's agents, contractors or employees, or (ii) the breach by Tenant of this Lease.

(c)    If either party, without fault on its part, is made a party to any litigation commenced by or against the other party, then such other party shall protect and hold such first party harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by such first party in connection with the litigation.

This Section 19 survives the expiration or termination of this Lease.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.: 2584305v6

## SECTION 20. WAIVER OF CLAIMS

Notwithstanding any provision to the contrary, Landlord and Tenant waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or improvements thereto, or any contents therein, by reason of fire, the elements or any other cause which could be insured against under the terms of a standard special form insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage insuring any loss suffered by either party, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees. This waiver applies regardless of whether either party actually obtains property insurance, and regardless of whether any insurance proceeds are collected. Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of claims herein contained shall expressly exclude any loss paid by the insured in the form of a deductible or self-insured retention. All property insurance policies required under this Lease covering the Premises or the Shopping Center must expressly waive any right on the part of the insurer against the other party for damage to or destruction of the Premises or the Shopping Center resulting from the acts or omissions of the other party.

## SECTION 21. PROPERTY AND LIABILITY INSURANCE

(a)     Landlord must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured thereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Landlord must deposit a certificate or other evidence of such insurance with Tenant.

(b)     Tenant must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord as an additional insured to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Tenant's evidence of insurance is maintained by Tenant's insurer on the website of Tenant's insurance broker, which can be accessed through Tenant's website, "JoAnn.com."

(c)     Landlord must keep the Premises and the Shopping Center, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other  terms that become the insurance industry standard in the future), including, without limitation, boiler and machinery,

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.: 2584305v6

plate glass, power failure (other than due to normal wear and tear or deterioration of an existing power source), mold, windstorm, terrorism (up to a maximum limit of $100,000), in amounts equal to at least 80% of the full replacement value thereof, or such greater amounts as may be required to prevent the application of co-insurance provisions. Such insurance must cover improvements in the Premises owned by Landlord, to the extent that the same are customarily insurable as part of the realty, but will not cover the cost of restoration or replacement of Tenant's Work or Tenant's furniture, furnishings, inventory, equipment and other personal property. Notwithstanding anything to the contrary, Landlord is solely responsible for any and all deductibles and self-insured retentions.

(d)     In addition to the payment of Fixed Minimum Rent, Tenant must pay its Proportionate Share of the premium paid by Landlord for maintaining the insurance for the Shopping Center required under subsections 21(a) and 21(c) (the "Insurance Costs"). Tenant must pay to Landlord in 12 equal installments, each in advance on the first day of each and every calendar month, an estimated sum towards Tenant's Proportionate Share of the Insurance Costs. During the first Lease Year, Landlord estimates that the insurance paid by Tenant will be $0.36 per year multiplied by the Gross Leasable Area of the Premises, which amount is Landlord's good faith estimate of the full amount of Tenant's Proportionate Share of Insurance Costs for the first Lease Year if Tenant were to pay Tenant's actual Proportionate Share of Insurance Costs for said period. This sum is subject to annual adjustments by Landlord to reflect actual changes in the Insurance Costs. On or before April 1 Landlord must provide Tenant with a statement assessing and prorating the Insurance Costs together with copies of all bills for which payment is sought. Tenant must pay to Landlord within 30 days of such receipt any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess will be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within 30 days after the end of such Lease Year. Landlord covenants that there will be no duplication of costs between this Section and any other Section of this Lease.

(e)     Tenant shall maintain worker's compensation insurance in amounts not less than required under the laws of the State of Alaska.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

## SECTION 22.  SIGNS

(a)    Tenant has the right to install and maintain a sign or individual letters ("JOANN, handmade happiness" or any other name or slogan that Tenant may adopt) or signs on the front, side, rear or any other fascia of the Premises, as well as a sign or signs on the directory(ies) and pylon(s), if any, located in or around the Shopping Center or for use by any of the tenants of the Shopping Center, and departmental signs on the front fascia in addition to its regular sign, all in accordance with Tenant's Prototype Plans attached hereto as Exhibit D and Tenant's Anchorage Signage Plans attached hereto as Exhibit D-1.   All signs will comply with all requirements of any Public Entity, and Tenant will obtain all necessary permits or licenses. Notwithstanding the foregoing, Tenant is entitled to seek and receive a variance from any Public Entity so as to allow Tenant to have the size, color, number, etc., of signs that Tenant desires, including storefront signs, pylon signs, banner signs and monument signs. Landlord must fully cooperate and assist Tenant with any such variance. Tenant's sole cost for the pylon and/or monument sign(s) shall be the cost to fabricate and install Tenant's panels. If at any time in the future Landlord constructs a new pylon sign for the Shopping Center or a panel on another existing pylon in the Shopping Center should become available, Tenant will have first right of refusal for the third panel on the new pylon or the available panel on the existing pylon.

(b)    Tenant's sign package shall be approved in accordance with the same process for approval of the plans for Premises build-out as outlined in Section 10 hereof.  In no event shall Landlord object to any part of Tenant's sign drawings to the extent the same is consistent with Tenant's Anchorage Signage Plans attached hereto as Exhibit D-1.

(c)    In addition to the foregoing signs, Tenant has the right to install and maintain a professionally prepared banner sign periodically in front of the Premises as shown on Exhibit D-1.

(d)    Tenant must maintain its signs in good condition and repair at all times, and must save the Landlord harmless from injury to person or property arising from the erection and maintenance of the signs. Upon vacating the Premises, Tenant must remove all signs and repair (exclusive of painting) all damage caused by such removal.

(e)    If Landlord renovates all or any portion of the Shopping Center, which renovation requires a change to the facade and/or the removal of any of Tenant's sign(s), Landlord shall not materially change the appearance of the façade without Tenant's consent and shall notify Tenant at least 45 days before the removal of sign(s). Landlord will bear the cost of such removal and reinstallation, together with the cost of any damage to the sign(s) as a result of such removal or reinstallation. Further, Landlord must provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) must be equal in size to Tenant's existing sign and approved by Tenant before such installation.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.: 2584305v6

## SECTION 23.  ASSIGNMENT AND SUBLETTING

(a)     Tenant has the right to assign this Lease or sublet all or any part of the Premises for any lawful purpose with the prior written consent of Landlord, which consent must not be unreasonably withheld or delayed, and which consent must not be denied in any event where (i) such assignment or subletting does not violate any existing exclusive use of another tenant open and operating from the Shopping Center (Landlord must provide Tenant with a list of existing exclusives upon Tenant's request or consent is deemed given and Landlord indemnifies Tenant); (ii) Tenant remains responsible for the payment of rent, unless expressly released in writing by Landlord; and (iii) in the case of assignment, such assignee assumes in writing all the terms and provisions of this Lease to be performed or observed by Tenant.  Notwithstanding the foregoing, Tenant may assign this Lease or sublet all or any part of the Premises, in each case without the prior consent of Landlord, to: (1) a parent; subsidiary; affiliated corporation; successor to Tenant; (2) or the parent of Tenant by away of merger, reorganization, consolidation, corporate restructuring, purchase of stock or assets, or the like; or (3) any entity that acquires a substantial number of Tenant's stores either generally or in the metropolitan area where the Premises are located.  Tenant may also sublet, without the consent of Landlord, not more than 10% of the Gross Leasable area of the Premises for the operation of one or more departments within the business operation of Tenant.

(b)     If Tenant assigns this Lease and Tenant's assignee or any subsequent assignee has, at the time of the assignment, or attains at any time after the assignment, a verifiable net worth according to GAAP (excluding goodwill) equal to or greater than Tenant with at least 50 stores open and operating, then Tenant shall be released and discharged from any further liability under this Lease.  Such net worth shall be determined as of the end of the most recent fiscal year preceding the intended release unless more current figures are available.

## SECTION 24.  REPAIR AFTER CASUALTY

(a)     In the event of damage to or destruction of the Premises by casualty or any other cause whatsoever, then, except as otherwise provided in this Section, Landlord shall forthwith proceed to repair such damage and restore the Premises to substantially their condition as of the Delivery Date.  Landlord must begin and diligently pursue to completion the restoration and repair within as soon as reasonably practicable after the event of damage or destruction.  Any repair or restoration of the Premises must upon commencement be diligently pursued to completion. Within 30 days after an event of damage or destruction, Landlord must deliver to Tenant notice of the anticipated period of restoration.

(b)     If 40% or more of the Premises are destroyed or damaged during the last two years of the Term, then each of Landlord and Tenant has the right to terminate this Lease as of the date of such damage or destruction by giving written notice thereof within 90 days after the date of the damage or destruction.

(c)     In the event of any damage or destruction to the Premises, then all Rent shall be

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

abated or reduced proportionately during any period in which, by reason of such damage or destruction, there is interference with the operation of the business of Tenant in the Premises, having due regard to the extent to which Tenant may be required to discontinue its business in the Premises, and such abatement or reduction shall continue for the period commencing with such destruction or damage and ending with: (i) the completion by Landlord of such work of repair or restoration as Landlord is obligated to do; and (ii) the expiration of a period of 150 days thereafter to enable Tenant to re-fixture the Premises and reopen for business, but said 150 day period shall be deemed to have ended if Tenant shall reopen for business to the public prior to the expiration thereof. In the event of any unusually inclement weather or act of God or other event of force majeure which in Tenant's reasonable business judgment makes it unsafe or inadvisable to conduct business at the Premises, and as a result Tenant closes for business at the Premises, then all Rent shall be abated from the date of such event and closure until the date on which Tenant reasonably determines it can reopen for business at the Premises.

(d)    If any other portion of the Shopping Center is substantially damaged (irrespective of whether the Premises shall have been damaged or destroyed), Landlord shall proceed promptly to rebuild the same. During any period of time that by reason of such damage or destruction there is material interference with access to or parking for the Premises such that it is impracticable for Tenant, in the reasonable exercise of its business judgment, to remain open for business and Tenant elects to close down until such damage or destruction has been repaired or rubble, etc., removed, there shall be a full abatement of Rent and all other charges payable hereunder until Landlord's completion of the restoration work.

(e)    In any event, if Landlord shall not commence, in good faith, repair and restoration work within 60 days after any damage which Landlord is required to repair pursuant to the terms hereof (which period shall be extended if required by Landlord's insurance provider), or if Landlord shall fail with all due diligence to continue with such repair and restoration work to completion, then Tenant shall, in addition to all other available remedies at law or equity or otherwise provided herein, have the following rights, at its option:

(i)    to terminate this Lease by giving notice of its election to do so to Landlord; or

(ii)    to the extent the damage is to the Premises, upon notice to Landlord to restore the Premises, as applicable, or have same done, in which event Landlord shall make the insurance proceeds available to Tenant for the completion of such restoration, and to the extent the insurance proceeds actually received by Tenant are insufficient to pay for all costs incurred by Tenant in connection with such restoration, Landlord shall reimburse Tenant for all restoration costs incurred by Tenant within 30 days after Tenant's request. If Landlord has not reimbursed Tenant within such 30 day period, Tenant may deduct all such costs, together with interest at the Default Rate herein, from the Rent next becoming due after the expiration of said 30 day period.

(f)    If this Lease is terminated pursuant to this section, Landlord must refund within

15 days of notice any Rent paid in advance.

(g)     If Landlord elects, or is required by this Section 24, to repair the Premises or the Shopping Center, then Landlord must notify Tenant in writing when the repairs are completed. The repairs will be not be deemed completed unless and until the repairs are actually completed in accordance with the terms of this Lease and Tenant has thereafter received written notice of such completion.

## SECTION 25.  CONDEMNATION

(a)     If 50% or more of the Gross Leasable Area of the Premises or 50% or more of the Gross Leasable Area of the Shopping Center is taken by condemnation or right of eminent domain or conveyed in lieu thereof or taken in any other manner for a period of three (3) months or longer (a "Taking"), this Lease will terminate at the option of either party as of the day possession is taken by or title vests in the taking authority, and both parties will be released from any further liability hereunder.

(b)     In the event of a Taking of less than 50%, but more than 5%, of the Gross Leasable Area of the Premises, then Tenant has the right to terminate this Lease and any further liability hereunder if, in the reasonable determination of Tenant, the Premises cannot be economically operated for, or are unsuitable, for the intended purposes of this Lease.  Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(c)     In the event of a Taking of any portion of the Premises or the Shopping Center, upon which this Lease is not terminated, Landlord must restore the remainder of the Premises or the Shopping Center (including the Common Areas), with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial Taking as shall be practicable, and if during or after the work of restoration Tenant is deprived of all or a part of the use of the Premises, the Rent will abate for so long as Tenant is deprived of such use and until Tenant has rebuilt, refixtured and restocked the Premises, as necessary, in the same proportion as that portion of the Premises taken bears to the entire Premises.

(d)     All damages awarded in connection with the Taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, belong to the Landlord; but, if Tenant has made any material leasehold improvements to the Premises, or alterations or structural changes and repairs to the Premises, at its own expense (regardless of when made), Tenant and not Landlord is entitled to claim an award for the unamortized balance of Tenant's cost thereof.  If the condemning authority does not make a separate award therefor, Landlord, subject to the rights of any mortgagee, must assign a portion of its award equal to such unamortized cost to Tenant.  If Landlord in obtaining its award uses Tenant's cost items, then Tenant is entitled, subject to the rights of any first Mortgagee, to a proportionate share of Landlord's award based upon the costs.  Tenant is also entitled to claim

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.:  2584305v6

an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses, in a separate action only.

## SECTION 26.   REPRESENTATIONS AND COVENANTS OF LANDLORD

    (a)    On the date hereof and hereafter during the Term, Landlord represents, warrants and covenants to Tenant as follows:

    (1)    The Shopping Center Site is zoned to permit the use of the Shopping Center for general retail purposes, and the Premises are zoned to permit their use as a retail store conducting the Permitted Use, as of right (i.e., without any special permit, approval, variance or other waiver);

    (2)    The legal description set forth on Exhibit A matches the Shopping Center depicted on the Site Plan (i.e., Exhibit B) and includes no additional property therein;

    (3)    The Common Areas, Premises (excluding Tenant's Work or other alterations made by or on behalf of Tenant, but not excluding Landlord's Work or work directed by Landlord on or behalf of Tenant) and all structural portions of the Shopping Center comply with all Laws;

    (4)    Landlord will provide surface parking spaces in the Common Areas on an unreserved basis (subject to other Shopping Center tenant rights) and without cost, parking in amounts not less than required by Laws;

    (5)    No building, edifice or obstruction will be placed on the Shopping Center Site and no addition or alteration will be made to the Shopping Center (A) that diminishes the accessibility of the Premises to and from the parking areas within the Common Areas and the other stores in the Shopping Center; (B) that diminishes the visibility of the front of the Premises (including, without limitation, the signage thereon) from the Old Seward Highway in front of the Premises, parking areas or other stores in the Shopping Center; (C) that diminishes the access to or the utility of the service areas serving the Premises; (D) that has the effect of increasing the monetary obligations of Tenant under this Lease (unless such change, alteration or addition is required by Law or such change, alteration or addition is otherwise permitted or allowed under this Lease); or (E) that otherwise adversely and materially affects the conduct of business from the Premises or the rights of Tenant under this Lease. Without limiting the generality of the foregoing, in no event will any improvement or alteration (including a reduction in size of the Protected Area through any means (except through an eminent domain proceeding), including, for example, a

Page 37-A

Supplement to Section 26(a)(5):

Notwithstanding anything to the contrary in Section 26(a)(5), Landlord and Tenant agree as follows:

- Landlord shall be permitted to make reasonable improvements and alterations to the parking lot portion (the area shown in cross-hatch) of the Protected Area, subject to further conditions as outlined below.

- Landlord shall not move or remove the current entrances/exits nearest to Tenant's Premises leading to 38th Avenue and Old Seward. Landlord may temporarily close an entrance for work/maintenance purposes, but Landlord shall keep the impact to Tenant as minimal as possible. Landlord may only move/remove an entrance/exit if due to regulatory requirements, eminent domain, or for a temporary emergency.

- Parking spaces in the Protected Area will not be designated as dedicated to Tenant specifically. Landlord agrees that it shall not designate parking spaces in the Protected Area to any other specific tenant, group or use going forward.

- If Landlord makes improvements or alterations that change the number of parking spaces in the Protected Area, the reduction will be minimal, and in no event shall such improvement or alteration reduce the number of parking spaces below the amount that is required for Tenant's Premises by code (currently, 89 spaces).

- ADA required parking will not be concentrated in the Protected Area but will be spread out equally over the entire parking lot serving the Shopping Center.

reduction in the Shopping Center or Shopping Center Site, or a change in the parking layout or configuration or traffic patterns of vehicles or pedestrians) be made to the "Protected Area" as shown on the Site Plan;

(6)     The Site Plan correctly and completely shows all improvements on or to be made to the Shopping Center Site;

(7)     [Intentionally Omitted];

(8)     Landlord will maintain, operate and manage the Shopping Center as a retail project in compliance with all Laws, and the Shopping Center will be used and occupied only for retail uses customarily conducted in shopping centers.

(9)     In no event will the current Sadler's Furniture space #1 or La-Z-Boy space #18 (as shown on the Site Plan), or any portion thereof be used as or for any of the following (the "Prohibited Uses"):

    (i)      a movie theater; auditorium; meeting or banquet hall;
    (ii)     church; bingo hall or a place of public assembly;
    (iii)    intentionally deleted;
    (iv)     for the sale or service of automobiles or other vehicles;
    (v)      night club or bar serving alcoholic beverages except as incidental to a restaurant ("incidental" shall be defined as deriving less than 25% of gross sales from the sale of alcoholic beverages); or liquor or beverage store;
    (vi)     funeral parlor; massage parlor;
    (vii)    animal clinic or animal boarding (kennel);
    (viii)   discotheque; dance hall or otherwise for musical/dance reviews or topless/nude shows;
    (ix)     karate studio; gymnasium; bowling alley; or skating rink;
    (x)      car wash;
    (xi)     off-track betting establishment, gambling, gaming, video gaming, etc.;
    (xii)    pool room, game room or amusement arcade (defined as any establishment containing more than a combination of three electronic, pinball or other games), gallery or store or pinball arcade;
    (xiii)   so-called "flea market"; or second hand, used goods or consignment store;
    (xiv)    store selling primarily distressed or damaged merchandise;
    (xv)     health club or spa;
    (xvi)    so-called "head shop"; or night club;

(xvii) gun range or gun shop;

(xviii) for warehousing, except as incidental to a retail business, and to exclude current warehouse space within the existing Shopping Center;

(xix) adult book store or store selling or exhibiting sexually explicit materials;

(xx) any business or use that emits offensive odors, fumes, dust or vapors or is a public or private nuisance or emits loud noise or objectionable sounds or creates fire, explosive or other hazard (e.g., motorized vehicle repair or body shop); provided, however, tire, battery or auto parts retail locations shall not be precluded under this Restricted Use;

(xxi) abortion clinic, aids clinic, drug treatment facility or bodily fluid collection facility; homeless shelter or halfway house;

(xxii) Intentionally Deleted;

(xxiii) animal kennel;

(xxiv) laundromat;

(xxv) Intentionally Deleted;

(xxvi) marijuana dispensary; or

(xxvii) tattoo parlor.

(10) Landlord owns fee simple title to the Shopping Center free and clear of all monetary liens and encumbrances except for the lien of the existing mortgage in favor of First National Bank Alaska. There are no claims of other parties, restrictions, reservations, or defects in Landlord's title which could materially interfere with or materially impair Tenant's rights under this Lease or Tenant's use, occupancy, or enjoyment of the Premises. Notwithstanding the foregoing, Landlord shall have the right at any time during the Term to subject to the Shopping Center to additional or different mortgages, liens or financial encumbrances;

(11) At the time of the Delivery Date, to Landlord's knowledge there are no planned or contemplated taxes and assessments, either general and specific, whether ad valorem, specific or otherwise, with respect to the Shopping Center; and

(12) To Landlord's knowledge, the Premises are free of Hazardous Material (other than encapsulated asbestos in the drywall of the Premises and lead based paint coating certain structural components of the Shopping Center and Premises).

(b) The representations, warranties and covenants in this Lease are material considerations and inducements to Tenant in executing this Lease, the breach of which will cause irreparable and severe harm to Tenant. Without limiting any other right or remedy of

Tenant, in the event of a breach of the representations, warranties, and covenants, Tenant has the right after providing Landlord with 30 days' prior written notice (i) to terminate this Lease at any time during the period of such breach; (ii) to pay Substitute Rent during the period of such breach.

## SECTION 27. TENANT'S DEFAULT

      (a)    Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises by summary proceedings, and may dispossess the Tenant if:

      (1)    Tenant fails to pay Rent on or before the due date and then fails to pay same within 10 days after receipt of written notice from Landlord;

      (2)    Tenant is in material default in the performance of any of the covenants, terms, conditions and provisions of this Lease, and Tenant fails to remedy such default within 30 days after receipt of written notice thereof (but Tenant will not be deemed to be in default if Tenant commences to remedy the default within the 30-day period and proceeds to cure with due diligence);

      (3)    Tenant is adjudged bankrupt or makes an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Premises is appointed in any action, suit or proceeding by or against Tenant and is not removed within 90 days (unless such 90-day period is extended by court order, in which event the time period will be as established by court order or established by such person(s) or entity acting under or for the court) after appointment; or

      (4)    The interest of Tenant in the Premises is offered for sale or sold under execution or other legal process, and if not rescinded within 90 days after written notice from Landlord to Tenant.

Landlord must use reasonable efforts to mitigate its damages. In the event of re-entry Landlord must use best efforts to relet the Premises and, in the event of a reletting, must apply the rent therefrom first to the payment of Landlord's reasonable expenses incurred and paid by reason of Tenant's default, next to the reasonable expense of reletting, including, but not limited to, reasonably necessary repairs to the Premises, then to the payment of rent and then to all other sums due from Tenant, with Tenant remaining liable for any deficiency. Any and all deficiencies shall be payable by Tenant monthly on the date provided for the payment of Fixed Minimum Rent. Notwithstanding anything to the contrary in this Lease, if Tenant has in good faith disputed an alleged monetary default for an

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

amount which is less than two months of Rent, and if Landlord obtains a final judgment adverse to Tenant with regard to said amount, wholly or in part, Tenant may within 30 days of the date of the journalized final judgment pay the amount set forth in the final judgment to Landlord and retain the right to possession of the Premises and all of its rights under the Lease, notwithstanding any termination of the Lease pursuant to the Lease or at law or in equity, which may have occurred as a result of said monetary default.

(b)     In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party has the right to invoke any remedy provided at law or in equity; except, however, Landlord is not entitled to terminate this Lease or to dispossess Tenant and re-enter the Premises except for a default set forth above and in no event is Landlord entitled to accelerate Rent. Notwithstanding anything contained herein, in no event is Landlord entitled to exercise self-help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate legal process. All remedies are cumulative and concurrent.

(c)     Notwithstanding anything to the contrary, with respect to any alleged default of Tenant other than a default in the payment of Rent, or other sums of money, if Tenant notifies the Landlord, within 30 days after Landlord's notice of such default, that Tenant disputes such alleged default and Tenant files within the 30-day period an action in a court of competent jurisdiction contesting such alleged default, then Tenant will not be deemed to be in default with respect to such matter.  If a final judgment is adverse to Tenant, wholly or in part, Tenant must immediately begin to correct the matters complained of by Landlord, or that portion thereof as to which such judgment shall have been adverse to Tenant, and complete the correction within 30 days after such judgment, or if more than 30 days are reasonably required to complete such correction, correct the same within 30 days and prosecute the same to completion with reasonable diligence.

## SECTION 28. RIGHTS OF LANDLORD

(a)     Landlord reserves the right at all reasonable times during Tenant's business hours and upon prior reasonable notice to Tenant (except in the event of emergency, when notice is not required) by itself or its duly authorized agents, to  inspect the Premises and, to make such repairs as Landlord is obligated to make to the Premises.  In exercising the foregoing right, Landlord must not interrupt or disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers.

(b)     If Landlord makes any payments on behalf of Tenant, which are Tenant's obligation, to fulfill Tenant's covenants, then any amount so paid by Landlord are declared to be "Additional Rent" and are due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

(c)     Landlord has the right during the last two months before the expiration of this Lease, so long as it does not interfere with Tenant's business, to exhibit the Premises and put up the usual notice "for rent" or "for sale", which notice will not be removed or hidden by Tenant. No more than one sign will be placed upon the Premises and the sign cannot exceed 12 feet square.

## SECTION 29.  LANDLORD'S DEFAULT

(a)     If Landlord fails to keep and perform any covenant or agreement to be kept and performed by Landlord, then Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, shall notify Landlord of such default and if Landlord does not cure (or commence to cure) within 30 days then Tenant has the right to perform such covenant or agreement for or on behalf of Landlord or make good any such default, and any amount or amounts that the Tenant advances on Landlord's behalf must be repaid by Landlord to Tenant on demand, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(b)     Except in the event of emergency, before performing any covenant or agreement on behalf of Landlord, Tenant will provide Landlord with written notice of Landlord's default and Tenant's intent to perform such covenant or agreement, and Landlord will have 30 days within which to complete performance of the same (and Landlord will not be deemed to be in default if Landlord commences to remedy the default within the 30-day period and proceeds to cure with due diligence). For purposes hereof, "emergency" means (i) any event which poses immediate threat of injury or damage to persons or property or (ii) any event which, in Tenant's judgment, threatens Tenant's ability to open for business as scheduled or impairs or interferes with Tenant's business operations.

(c)     If Landlord fails to pay any sum to Tenant when due, and if such failure continues for 10 days after receipt of notice from Tenant, Tenant has the right, without forfeiture of its other rights hereunder, at its election, to setoff and deduct the same, together with interest thereon at the Default Rate, from Rent.  Notwithstanding the foregoing, Tenant's rights of offset under Section 10 hereof will be governed by Section 10.

## SECTION 30. MORTGAGE SUBORDINATION

(a)     Landlord must obtain and deliver to Tenant a non-disturbance and attornment agreement, substantially in the form of Exhibit G (the "SNDA"), from any existing ground lessor, mortgagee or lien holder.

(b)     Landlord reserves the right to request from Tenant a waiver of priority of Tenant's leasehold estate hereunder for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.:  2584305v6

Landlord may hereafter deem necessary or desirable. Tenant, upon such request by Landlord, will execute and deliver an agreement substantially in the form of Exhibit G. The word "mortgage" means (y) any lease of land only or of land and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center, or (z) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions, renewals and replacements thereof. "Mortgagee" means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

(c)     After a change in ownership of all or any portion of the Shopping Center that requires a change in the Rent payee, or assignment of this Lease by Landlord that requires a change in the Rent payee, Tenant shall have no obligation to pay Rent to the new payee until Tenant receives written notice from Landlord confirming the name and address of the new payee.

## SECTION 31. NO WAIVER

No waiver by either party of any of the terms, covenants, provisions or conditions in this Lease, and no waiver of any legal or equitable relief or remedy, will be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason. No waiver of any of the terms, provisions, covenants, rules and regulations herein will be valid unless it is in writing signed by both parties. No waiver by either party, or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center, will constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant. The waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease will not be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 32.  SURRENDER OF PREMISES

(a)     Tenant must deliver up and surrender to Landlord possession of the Premises, including all Landlord's Work (and replacements thereof) and all improvements permanently attached to the Premises during the Term, upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same are in on the Commencement Date (excepting damage by fire or other casualty which could be covered by a standard "All-Risk Coverage" or "special form" insurance policy, ordinary wear and tear, authorized alterations and modifications, and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof). Upon the expiration or earlier termination of this Lease, Tenant will deliver the keys at the office of Landlord or Landlord's agent. Tenant will have an additional ten-day Rent-free period after expiration or termination of the Lease to remove its signs, trade fixtures, furnishings, inventory, equipment, furniture and other personal property.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.: 2584305v6

(b)     Tenant has the right, while the Lease remains in effect, to place a banner sign at the front of the Premises, in a place visible to Tenant's customers, directing Tenant's customers to another store of Tenant or providing Tenant's customers with information and a telephone number. If the Lease has terminated or expired, then Landlord must leave the sign at the front of the Premises until the earlier to occur of (1) 90 days after Tenant vacates the Premises; or (2) a new tenant opens for business in that location.

## SECTION 33.   SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT

(a)     Neither party may record this Lease, but if either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party must execute such Agreement, which Agreement will contain the information set forth below. The Short Form Lease or Memorandum of Lease will describe the Premises and the rights herein demised, the Term, and the extension rights (if any), any exclusive granted to Tenant and other provisions hereof reasonably requested by Tenant.   The failure to record the Short Form Lease or Memorandum of Lease will not affect or impair the validity and effectiveness of this Lease, and this Lease will control in the event of any inconsistency between the two.   The party requesting that the Short Form Lease or Memorandum of Lease be recorded must prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party must execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be required for such recording.

(b)     At the time that the Commencement Date is established, the parties will promptly enter into a Commencement Date Agreement, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof, any applicable kickout dates, the then current Gross Leasable Area of the Premises and the corresponding Rent, which Commencement Date Agreement may be recorded by either party if both parties agree to said recordation in advance.   If the recipient of such request does not object to the Commencement Date specified in such request within 30 days after receipt of the request, the date specified in such request shall be deemed to be the Commencement Date herein.

## SECTION 34.   NOTICE

Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other must be in writing and must be given by Certified U.S. Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Federal Express) addressed as follows:

if to the Landlord at:          Furniture Enterprises of Alaska, Inc.
                                940 East 38th Avenue
                                Anchorage, AK 99503
                                Attn: Jolene Anderson

| if to the Tenant at: | Jo-Ann Stores, LLC |
| | 5555 Darrow Road |
| | Hudson, Ohio 44236 |
| | Attn: National Director of Real Estate |
| | |
| with a copy to: | Jo-Ann Stores, LLC |
| | 5555 Darrow Road |
| | Hudson, Ohio 44236 |
| | Attn: Senior Legal Counsel |

or at such other address of Landlord or, Tenant as may be specified by such a notice. Any notice sent by certified mail is deemed to have been served three days after deposit thereof with the U.S. Postal Service. Any notice sent by courier service is deemed to have been served as of the next business day (excluding Saturdays, Sundays, and any federal government holidays). Notwithstanding the foregoing, the time period in which a response to any such notice must be given, or in which an action must be commenced or be taken, will commence to run on the date of receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice. Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given, will be deemed to be receipt of notice as of the date of such rejection, refusal or inability to deliver. Notwithstanding anything to the contrary, Tenant may give facsimile notice of the need of emergency repairs, followed promptly by notice as required above.

## SECTION 35. HAZARDOUS MATERIALS

(a)     Tenant must not cause or permit the escape, disposal or release of any Hazardous Material (as hereafter defined) in violation of Law. Tenant must not allow the storage or use of Hazardous Material in any manner not sanctioned by Law, nor allow to be brought into the Shopping Center any Hazardous Material except to use in the ordinary course of Tenant's business. Tenant must defend, indemnify and hold Landlord harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. It is a condition to indemnification that Tenant receive notice of any claim by Landlord promptly after Landlord first has knowledge thereof. This indemnity survives the expiration or earlier termination of the Term.

(b)     Landlord must not cause or permit any Hazardous Material to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center (including the Premises, before the Delivery Date) without in each case: (i) obtaining all

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

necessary permits required in connection therewith; and (ii) complying with all permit requirements; and (iii) otherwise taking all appropriate steps and making adequate arrangements to assure that such Use is in the ordinary course of business in the operation of the Shopping Center. Such Use must be performed safely and without contamination of the Shopping Center and the Shopping Center Site or any portion thereof and fully in compliance with all applicable Laws. Landlord must defend, indemnify and hold Tenant harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Landlord under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Landlord or Landlord's contractors, agents or employees or persons acting under Landlord. It is a condition of this indemnification that Landlord receive notice of any such claim by Tenant promptly after Tenant first has knowledge thereof. Notwithstanding anything contained herein, Tenant acknowledges that there is encapsulated asbestos in the drywall within the Premises and lead based paint coating certain structural components of the Shopping Center and Premises, and Landlord shall have no liability to Tenant hereunder on account of such encapsulated asbestos or lead based paint. This indemnity survives the expiration or early termination of this Lease.

(c) If either party receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises, then the receiving party must give immediate oral and written notice of same to the other party detailing all relevant facts and circumstances within the knowledge of the receiving party.

(d) If Tenant's use, occupancy and enjoyment ("Occupancy") of the Premises is materially interfered with by reason of this existence or remediation of any Hazardous Material located on, in or under the Shopping Center or on the Shopping Center Site (except for any Hazardous Material used by Tenant), then (i) throughout such period of interference, a fair and just proportion of the Rent and other charges payable (taking into account the nature of the interference to Tenant's Occupancy), will be abated, and (ii) if Tenant's occupancy is substantially impaired for three months or more, then Tenant has the right to terminate this Lease by giving written notice to the other of its election to do so, whereupon this Lease will automatically terminate and end effective as of the date of such notice and neither party will have any further obligations hereunder. Landlord may nullify Tenant's notice of termination if Landlord diligently corrects the Hazardous Material interference and completes the job in accordance with all applicable governmental laws, codes, regulations and requirements within three months after the date of Tenant's termination notice. The abatement provided in clause (i) of this subsection will continue throughout the period of such correction by Landlord.

(e) "Hazardous Material" means (i) any waste, pollutant, material, substance or

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

contaminant which is or becomes listed, defined, or classified as having properties harmful to health, safety, or indoor or outdoor environment; and (ii) any substance or material that is or becomes regulated by any Public Entity by reason of the hazardous or toxic qualities of such substance or material.

(f) "Hazardous Discharge" means the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Material (i) on or about or emanating from the Shopping Center or the Shopping Center Site, or (ii) arising out of the use and occupancy of or operations within the Shopping Center, or (iii) caused by Landlord or other occupant of the Shopping Center or the employees, contractors, invitees or agents thereof.

(g) "Environmental Complaint" means any complaint, investigation, order, citation, or action with regard to any Hazardous Discharge, air emissions, water discharges, noise emissions or any other environmental, health or safety matter pertaining to or emanating from the Shopping Center from any Public Entity.

## SECTION 36. LIMITATION OF LANDLORD'S LIABILITY

(a) If Landlord fails to perform any covenant, term or condition on Landlord's part to be performed, and as a consequence of such default Tenant recovers a money judgment against Landlord, such judgment will be satisfied only out of (i) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, (ii) the rents and other income from such property receivable by Landlord, and (iii) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, which consideration is deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, and Landlord shall not be liable for any deficiency.

(b) Notwithstanding subsection (a), in the event of fraud on the part of Landlord or Landlord's failure to perform any covenant or obligation of Landlord under Sections 10, 12, 14, 24, 25 or 35 the aforesaid limitation on liability is inapplicable. This Section will not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by Law or under this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29.

## SECTION 37. DELIVERY OF SITE PLAN

Within 30 days after Tenant's written request therefor, Landlord must provide Tenant with a copy of the most current available site plan of the Shopping Center, which must reflect:

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

(a) the Gross Leasable Area of the Shopping Center as actually constructed; (b) the names and location and the Gross Leasable Area of the premises occupied by the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business. If Landlord fails to provide this information within the period allowed, then Tenant has the right to suspend the payment of monthly installments of Additional Rent, or Rent if there is no Additional Rent, until delivery of the information, which Additional Rent or Rent, as the case may be, shall be paid in full upon Landlord's compliance with this Section 37.

## SECTION 38.   INTENTIONALLY OMITTED

## SECTION 39.   ENTIRE AGREEMENT; WRITING REQUIRED

This Lease contains all of the agreements of the parties with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter will be effective for any purpose.  No provision of this Lease may be changed, deleted, modified or amended, except by an agreement in writing signed by the parties.

## SECTION 40.   OPERATING COVENANT

(a)     Tenant will open from the Premises within 90 days after the Commencement Date and continue to operate from the Premises during Tenant's normal business hours for a period of 24 months (the "Operation Period"), but for an assignment or subletting, damage and destruction, remodeling, eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity.  After the Operation Period, notwithstanding anything contained in this Lease, expressly or impliedly, to the contrary, and notwithstanding the agreement for the payment by Tenant of Rent (including Substitute Rent or other percentage rent), Tenant is under no duty or obligation, either expressed or implied, to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises at any time during the Term.  After the Operation Period, Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises will not in any way be deemed an event of default under this Lease, nor will such failure otherwise entitle Landlord to begin or to maintain any action, suit or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises.

(b)     If Tenant ceases to operate its business from the Premises for 180 consecutive days, but for an assignment or subletting, damage and destruction, remodeling, eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity, then Landlord has the right to terminate the Lease upon 90 days prior written notice.  If Landlord terminates the Lease, it must do so by written notice to Tenant. Tenant will have the right, within 30 days of receipt of Landlord's termination notice, to advise Landlord that Tenant will reopen for business from the Premises. If Tenant elects to reopen for business, then it must do so within

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

- 48 -

Case 3:20-cv-00272-JMK   Document 1-1   Filed 10/26/20   Page 60 of 88

Exhibit A
EXHIBIT A
Page 60 of 88

60 days of its notice to Landlord; otherwise, Tenant's notice will be null and void. Tenant's obligations under this Lease will terminate as of the effective date of such notice.

## SECTION 41.  APPLICABLE LAW AND CONSTRUCTION

The laws of the state within which the Premises are located govern the validity, performance and enforcement of this Lease without regard to its conflicts of law principles. If one or more of the provisions of this Lease is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect or impair any other provision of this Lease, and this Lease will be construed as if such invalid, illegal or unenforceable provision had not been contained herein. The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease has been negotiated by Landlord and Tenant and will not be deemed to have been prepared by either Landlord or Tenant, but by both equally. All prior negotiations, considerations, representations and understandings between the parties are and shall be deemed to be incorporated and merged into this Lease and shall not be construed as having survived the execution hereof so that only the provisions of this Lease shall govern the respective rights and obligations of the parties hereto to the same effect as if all such negotiations, considerations, representations and understandings shall have never been made or given by either party to the other party hereto.

## SECTION 42.  UNAVOIDABLE DELAYS

Except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay will not excuse prompt and timely payments, including Rent, when due under this Lease except when (A) the Commencement Date is delayed by reason of Unavoidable Delay; or (B) such payment is excused pursuant to other provisions of this Lease. No delay due to Unavoidable Delay will be excused by this section unless (1) the delayed party notifies the other party in writing of the delay within 21 days of the event giving rise to such delay; (2) the delayed party has exhausted all other alternatives to performance available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances will Unavoidable Delay extend the time for performance of any obligation by more than 90 days.

## SECTION 43.  REASONABLE CONSENT

Wherever either party's consent or approval is required, such consent or approval must not be unreasonably or arbitrarily withheld or delayed, unless otherwise expressly stated.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.:  2584305v6

- 49 -

## SECTION 44. NO PARTNERSHIP

Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a joint venture, or a member of a joint enterprise with the other. Neither party is liable for payment of the debts or performance of any obligation of the other. The relationship is and shall be that of Landlord and Tenant.

## SECTION 45. ESTOPPEL

Within 30 days after request, Tenant will execute and deliver to Landlord a Tenant Estoppel Certificate substantially in the form of Exhibit H. Within 30 days after request, Landlord will execute and deliver to Tenant a written instrument certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that this Lease is in full force and effect as modified and stating all such modifications; specifying the dates to which Rent has been paid; stating whether there exists any default in the performance by either party under any provision of this Lease; and certifying as to such other matters as Tenant reasonably may request. With regard to any estoppel certificates related to this Lease, the Lease will take precedence over the contents of such estoppel certificates, should a conflict arise.

## SECTION 46. QUIET ENJOYMENT

Landlord represents and warrants to Tenant that Landlord has full power and authority to execute and deliver this Lease. Landlord covenants to Tenant that Tenant shall at all times have peaceable and quiet enjoyment and possession of the Premises and of the rights granted hereunder without any manner of hindrance from Landlord or any other person or persons, if Tenant performs all the covenants and agreements to be performed on Tenant's part. If a violation of this the section occurs, in addition to any other remedies available to Tenant, Tenant shall have the right to pay Substitute Rent commencing on the first date of the violation and continuing until such violation is cured.

## SECTION 47. HOLDING OVER

Notwithstanding anything to the contrary in the Lease, upon the expiration of the Initial Term, Options or any extensions, the Lease shall automatically convert to a month-to-month tenancy upon the same terms and conditions (including rental) which exist at the time of Lease expiration, and either party may terminate the Lease during said month-to-month tenancy upon 90 days prior written notice to the other party; provided, however, Landlord shall not specify a Lease termination date during the period commencing September 1 and ending January 31.

## SECTION 48. BROKERS

Each party represents to the other party that it has not dealt with any party with regard to

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION: July 12, 2019
UB Document No.: 2584305v6

the Premises or this Lease, except Commercial Real Estate Alaska ("Broker"). Landlord will pay Broker pursuant to a separate agreement between Landlord and Broker and it is agreed that if Landlord does not pay Broker, Tenant shall have the right to pay Broker for fees due and set-off said amounts against Rent due Landlord. Each party will indemnify and hold the other party harmless from and against any loss, cost, liability and expense, including reasonable attorney's fees, arising out of a breach of its representation in this section.

**SECTION 49.  INTENTIONALLY DELETED**

**SECTION 50.  CLAIMS LIMITATION**

All actions or claims by Landlord for Rent shall be barred three years after the end of each Lease Year or Partial Lease Year. All actions or claims by Tenant for recovery of excess payments of Rent shall be barred three years after the end of each Lease Year or Partial Lease Year, except that in the case of any component of Additional Rent, the same will not be barred until three years after Tenant's receipt of Landlord's annual reconciliation statement furnished with respect to that Lease Year or Partial Lease Year. The forgoing limitations shall not apply in the event of fraud or willful mis-statement of the amounts so stated.

**SECTION 51.  CAPTIONS**

Any paragraph titles or captions contained in this Lease are for convenience only and do not define, limit or otherwise modify the scope or intent of this Lease.

**SECTION 52.  VARIATION IN PRONOUNS**

All the terms and words used in this Lease, regardless of the number and gender in which they are used, will be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

**SECTION 53.  SECTION REFERENCES**

All references to any section number(s) refer to the Section contained in this Lease.

**SECTION 54.  BINDING EFFECT OF AGREEMENT**

This Lease and all of the covenants, conditions, provisions and restrictions herein inures to the benefit of and binds the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of Landlord and Tenant.

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.:  2584305v6

Exhibit **EXHIBIT A**

## SECTION 55.  ATTORNEY'S FEES

If Landlord or Tenant is required to enforce this Lease, then the non-prevailing party must pay to the prevailing party the prevailing party's arbitration costs (if any), court costs and reasonable attorney's fees. This provision applies to court costs and attorney's fees incurred in any trial and appellate courts.

## SECTION 56.       OFAC WARRANTY

Each party represents and warrants to the other party that the representing party (a) is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control, and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of, or instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party must defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the forgoing representation.

## SECTION 57.       PDF/COUNTERPART SIGNATURE

This Lease may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart. In order to facilitate the finalization of this Lease, the parties agree that signatures transmitted by facsimile machine or signatures transmitted via e-mail in a "PDF" format may be used in place of original signatures on this Lease.  Each party intends to be bound by such party's facsimile or "PDF" format signature on this Lease, is aware that the other parties are relying on such party's facsimile or "PDF" format signature, and hereby waives any defenses to the enforcement of this Lease based upon the form of signature.  Promptly following any facsimile transmittal or e-mail transmittal of "PDF" format signatures, the parties shall deliver to the other parties the original executed Lease by reputable overnight courier to the notice addresses listed herein (it being agreed and understood that the delivery of such original shall not be a condition to the binding nature of the facsimile or electronic copy of the document provided such document is received by the parties).

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Store # 2545, University Center, Anchorage, Alaska
EXECUTION VERSION:  July 12, 2019
UB Document No.: 2584305v6



PROTECTED AREA

NOT PART OF SHOPPING CENTER



# JO-ANN fabric and craft stores®

* ALL WORK IDENTIFIED WITHIN THIS MATRIX TO BE PER CURRENT JO-ANN STORES, INC. PROTOTYPE SET OF PLANS. NOT ALL PROTOTYPE ITEMS ARE ADDRESSED IN THIS MATRIX. IT IS THE LANDLORD'S RESPONSIBILITY TO COMPLY WITH ALL CURRENT PROTOTYPE REQUIREMENTS AND CURRENT DWG'S.
* LANDLORD SHALL BE REQUIRED TO PURCHASE THROUGH JO-ANN STORES, INC. NATIONAL ACCOUNT VENDORS WHERE REQUIRED FOR THE CURRENT PROTOTYPE.
* JO-ANN MEANS JO-ANN STORES NATIONAL ACCOUNT VENDOR OR JO-ANN STORES GENERAL CONTRACTOR.
* IF THERE IS A DISCREPANCY BETWEEN JO-ANN'S PROTOTYPICAL DOCUMENTS AND THIS MATRIX WITH RESPECT TO RESPONSIBILITY FOR ANY ITEM, THIS MATRIX WILL GOVERN AND CONTROL.
* ITEMS CHECKED "AS-IS" ARE DELIVERED IN AS IS CONDITION WITHOUT WARRANTY OR REPRESENTATION EXCEPT AS MAY OTHERWISE BE PROVIDED IN THE LEASE, THIS EXHIBIT OR ANY OTHER EXHIBIT TO THE LEASE.
* ITEMS CHECKED "EXISTING" ARE A WARRANTY AND REPRESENTATION BY LANDLORD THAT THE EXISTING PREMISES MEET THE SPECIFICATIONS AND CONDITIONS DESCRIBED IN THE LINE ITEM AND THAT THE PREMISES WILL BE DELIVERED TO TENANT IN ACCORDANCE THEREWITH.
* ANY AS-IS OR EXISTING CONDITION REQUIRING WORK MUST RECEIVE A CLARIFICATION NOTE.

## SHELL PROJECT

| DIVISION OF WORK | AS-IS | EXISTING | NOT APPLICABLE | JO-ANN | LANDLORD | |
|---|---|---|---|---|---|---|
| **1.0 GENERAL** | | | | | | |
| 1.1 | | | | | X | OBTAIN ALL APPLICABLE SHELL PERMITS, UTILITY PERMITS, PLANNING AND ZONING PERMITS; TURN OVER CODE COMPLIANT SHELL BUILDING TO TENANT/TENANT'S GENERAL CONTRACTOR |
| 1.2 | | | | X | | OBTAIN ALL APPLICABLE TENANT IMPROVEMENT PERMITS, TEMPORARY CERTIFICATE OF OCCUPANCY FOR FIXTURING/MERCHANDISING, FINAL CERTIFICATE OF OCCUPANCY, TURN OVER CODE COMPLIANT BUILDING |
| 1.3 | | | | | X | FULL SET ARCHITECTURAL/MECHANICAL/ELECTRICAL/PLUMBING AND STRUCTURAL DOCUMENTS FOR SHELL CONSTRUCTION BASED ON TENANT'S CURRENT PROTOTYPE |
| 1.4 | | | | X | | APPROVAL OF CONSTRUCTION DOCUMENTS AND STORE FRONT ELEVATION PRIOR TO CITY SUBMITTAL |
| 1.5 | | | | X | | FULL SET ARCHITECTURAL/MECHANICAL/ELECTRICAL/PLUMBING AND STRUCTURAL DOCUMENTS FOR TENANT IMPROVEMENT CONSTRUCTION BASED ON TENANT'S CURRENT PROTOTYPE AND DWG'S |
| 1.6 | | | | | X | PERMIT FEES FOR SHELL CONSTRUCTION |
| 1.7 | | | | X | | PERMIT FEES FOR TENANT IMPROVEMENT CONSTRUCTION |
| 1.8 | | | | X | | STORE FIXTURE INSTALLATION PERMIT AND ASSOCIATED FEES |
| 1.9 | | | | X | | PERFORM ROOF INSPECTION THE WEEK TENANT'S CONSTRUCTION STARTS |
| 1.10 | | | | | X | PERFORM ROOF INSPECTION; PROVIDE RESULTS TO TENANT |
| 1.11 | | | X | | | PERFORM HVAC INSPECTION |
| 1.12 | | | X | | | PERFORM MOISTURE SLAB TESTING PER ASTM F 1869-[illegible] AND/OR ASTM F 2170-[illegible] STANDARDS (TENANT'S CURRENT PROTOTYPE), PER TERMS OF THE LEASE |
| 1.13 | | | X | | | REMEDY IF SLAB MOISTURE IS DETECTED |
| 1.14 | | | | | X | EXISTING SANITARY LINES TO BE SCOPED, RESULTS SENT TO TENANT |
| 1.15 | | | | | X | COMPLIANCE WITH ALL SEISMIC REQUIREMENTS, SHELL BUILDING |
| 1.16 | | | | X | | COMPLIANCE WITH ALL SEISMIC REQUIREMENTS, INTERIOR BUILDING |
| 1.17 | | | | | X | LANDLORD'S GENERAL CONTRACTOR SHALL PROVIDE WEEKLY CONSTRUCTION STATUS REPORTS AND 10-12 PROGRESS PHOTOS (JPEG) TO TENANT DURING SHELL CONSTRUCTION |
| 1.18 | | | X | | | CLOSE OUT PACKAGE THROUGH TENANT'S NATIONAL ACCOUNT VENDOR |

1.10: Report results also to be provided to NCL. 1.11: No RTU's existing. 1.14: Based on the Tenant plan, only existing U/G lines to be utilized by tenant as determined by DB mechanical engineer will be scoped by LLD. *See Additional Comments.*

| DIVISION OF WORK | AS-IS | EXISTING | NOT APPLICABLE | JO-ANN | LANDLORD | |
|---|---|---|---|---|---|---|
| **2.0 UTILITIES** | | | | | | |
| 2.1 | | | | | X | UTILITY FEES (CONNECTION/START UP FEES) |
| 2.2 | | X | | | | SEPARATE UTILITIES (ELECTRIC, GAS, WATER); DEDICATED SERVICES FOR TENANT, DEDICATED METERS FOR TENANT, IDENTIFY ANY SUB-METERS, COMMUNICATE METER NUMBERS TO TENANT |
| 2.3 | | X | | | X | ALL UTILITY SERVICES BROUGHT TO TENANT SPACE (APPROVED LOCATION) |
| 2.4 | | X | | | | MINIMUM 400 AMP 277/480V OR 800 AMP 120/208V ELECTRICAL SERVICE WITH METER, CURRENT TRANSFORMER CABINET, DISCONNECT SWITCH(ES) PER TENANT'S LOCATION |
| 2.5 | | | X | | | SEPARATE EXTERIOR ACCESS TO ELECTRICAL ROOM, WHEN EXISTING ELECTRICAL EQUIPMENT SERVICES MULTIPLE TENANTS |
| 2.6 | | X | | | | INCOMING GAS SERVICE AND METER |
| 2.7 | | X | | | | 3/4" MINIMUM INCOMING WATER SERVICE, 40 PSI, COORDINATE SERVICE SIZE WITH REQUIRED PLUMBING FIXTURE QUANTITIES |
| 2.8 | | | | | X | WATER SERVICE BACKFLOW PREVENTER |
| 2.9 | | X | | | | DEDICATED 4" SANITARY LINE WITH [illegible] |
| 2.10 | | | | | X | PLYWOOD TELEPHONE BOARD [illegible] |
| 2.11 | | | | | X | INCOMING TELEPHONE SERVICE [illegible] |
| 2.12 | | | X | | | SEPARATE EXTERIOR ACCESS [illegible] |
| 2.13 | | | | | X | [illegible] |
| 2.14 | | | X | | | SEPARATE EXTERIOR ACCESS TO SPRINKLER RISER ROOM [illegible] |
| 2.15 | | | | | X | [illegible] |
| 2.16 | | | | | X | 3" CONDUIT WITH PULL STRING FROM REMOTE SPRINKLER RISER ROOM TO TENANT'S SPACE (APPROVED LOCATION) |

2.1-[illegible]

| DIVISION OF WORK | AS-IS | EXISTING | NOT APPLICABLE | JO-ANN | LANDLORD | |
|---|---|---|---|---|---|---|
| **3.0 EXTERIOR - SITE** | | | | | | |
| 3.1 | | | | | X | [illegible] |
| 3.2 | | | | | X | SIDEWALKS - NEW OR EXISTING REPAIRED TO LIKE-NEW CONDITION LEASE LINE TO LEASE LINE |
| 3.3 | | | | | X | CURBS - NEW OR EXISTING REPAIRED TO LIKE-NEW CONDITION LEASE LINE TO LEASE LINE |
| 3.4 | | | X | | | PARKING LOT PAVING AND STRIPING, IF NEW CONSTRUCTION |
| 3.5 | | | | | X | PARKING RESEALING AND RESTRIPING, IF EXISTING |
| 3.6 | | | | | X | CODE COMPLIANT ACCESS RAMP WITHIN 25 FT OF CENTERLINE OF ENTRY DOORS - NEW OR EXISTING IN LIKE-NEW CONDITION |
| 3.7 | | | | | X | CROSSWALK STRIPING AT ENTRY - NEW PAINT |
| 3.8 | | | | X | | PIPE RAIL CART CORRALS (AT SIDEWALK) |
| 3.9 | | | | X | | PIPE RAIL CART CORRALS (IN PARKING LOT) |
| 3.10 | | | X | | | LANDLORD APPROVAL FOR DEDICATED STORAGE AREA FOR 5 CARDBOARD BALES OUTSIDE BUILDING; REAR [illegible] DOOR; AND CONSTRUCTION OF ENCLOSURE IF REQUIRED BY CODE |
| 3.11 | | | | | X | [illegible] DUMPSTER PAD, SLEEVED BOLLARDS (AND ENCLOSURE WHEN REQUIRED) |
| 3.12 | | | | | X | TRASH DUMPSTER/RECYCLE CONTAINER |
| 3.13 | | | | | X | COMPACTOR PAD, SLEEVED BOLLARDS |
| 3.14 | | X | | | | PARKING LOT LIGHTING PER TENANT'S PROTOTYPE |
| 3.15 | | | | | X | MONUMENT/PYLON SIGN STRUCTURE |
| 3.16 | | | | | X | MONUMENT/PYLON SIGN ELECTRICAL |
| 3.17 | | | | | X | DIVISION OF MONUMENT/PYLON PANELS, IF APPLICABLE |
| 3.18 | | | | X | | MONUMENT/PYLON SIGN PANELS FOR TENANT |
| 3.19 | | | | | X | LANDLORD APPROVAL TO ALLOW TENANT TO INSTALL EXTERIOR CART CONTAINMENT SYSTEM |

3.[illegible] [illegible] LLD to approve. See Add'l Comments.

| DIVISION OF WORK | AS-IS | EXISTING | NOT APPLICABLE | JO-ANN | LANDLORD | |
|---|---|---|---|---|---|---|
| **4.0 EXTERIOR - BUILDING** | | | | | | |
| 4.1 | | | | | X | EXTERIOR WALLS - MODIFICATIONS AND/OR PENETRATION |
| 4.2 | | | | X | | COMPACTOR DOOR (INCLUDING PENETRATION IF APPLICABLE) |
| 4.3 | | | | | X | ROOF HATCH (INCLUDING ROOF PENETRATION), LADDER AND CAGE BY TENANT |
| 4.4 | | | X | | | TENANT'S EXTERIOR PROTOTYPE FRONT FACADE/ENTRY ELEMENT |
| 4.5 | | X | | | | TENANT'S MALL PROTOTYPE FRONT FACADE/ENTRY ELEMENT |
| 4.6 | | | | | X | NON-PROTOTYPICAL FACADE ENTRY ELEMENT |
| 4.7 | | | | | X | COLOR RENDERING |
| 4.8 | | | | | X | EXTERIOR EGRESS DOOR(S) QUANTITY PER CODE, LOCATED PER TENANT LAYOUT; ADA COMPLIANT; WITH TENANT'S REQUIRED HARDWARE |
| 4.9 | | | | | X | FROST SLAB CONSTRUCTION AT EXTERIOR DOORS PER CODE |
| 4.10 | | | X | | | AT-GRADE DELIVERY DOCK AREA; 14' X 14' CONCRETE PAD WITH ADJACENT MAN DOOR WITH TENANT'S REQUIRED HARDWARE; REAR TRUCK AXLE MUST REST ON PAD, SIZE ACCORDINGLY |
| 4.11 | | | | | X | RECESSED DELIVERY DOCK (48"AFF) WITH ADJACENT MAN DOOR WITH TENANT'S REQUIRED HARDWARE |
| 4.12 | | | | | X | DELIVERY DOCK EQUIPMENT (LEVELER, SEALS, BUMPERS) OPERATIONAL, LIKE-NEW CONDITION |
| 4.13 | | X | | | | OVERHEAD COILING DELIVERY/BALE ACCESS DOOR (8'X10') WITH TENANT'S REQUIRED HARDWARE |
| 4.14 | | | | | X | STOREFRONT FRAMING AND GLAZING |
| 4.15 | | | | | X | EXTERIOR AUTOMATIC SLIDING ENTRY DOOR UNIT; WITH TENANT'S REQUIRED HARDWARE |
| 4.16 | | | | | X | NEW DOOR HARDWARE ON ALL SHELL BUILDING DOORS (NEW OR EXISTING) |
| 4.17 | | | | X | | FACADE SIGNAGE |
| 4.18 | | | | X | | TEMPORARY BANNERS (NOW HIRING, COMING SOON, NOW OPEN) |
| 4.19 | | | | X | | TEMPORARY SITE SIGN |

*** 4.4, 4.5, 4.6, 4.7 - ALL INTERIOR/EXTERIOR FACADE ELEMENTS AND COLOR RENDERINGS TO BE AGREED UPON BY BOTH PARTIES AND SIGNED OFF BY TENANT'S CONSTRUCTION DEPARTMENT PRIOR TO LEASE EXECUTION.**

4.1: LLD to remove existing exterior vestibule, & either remove storefront glass or cover-up, paint front block, and construct new façade above entrance. LLD & Tenant to work on design. Tenant will have exterior entrance only and LLD to close interior mall entrance. 4.2: New compactor door @ OHD location. JOANN will install door and infill remaining opening. 4.3: There is a shared roof access on site. 4.7: [illegible] See Additional Comments.

| DIVISION OF WORK | AS-IS | EXISTING | NOT APPLICABLE | JO-ANN | LANDLORD | |
|---|---|---|---|---|---|---|
| **5.0 INTERIOR - BUILDING** | | | | | | |
| 5.1 | | | | | X | CONSTRUCTION OF DEMISING WALLS - METAL STUDS, GYPSUM BOARD W/ CONTROL JOINTS, SOUND INSULATION, FINISHED (FIRE RATED, IF REQUIRED BY CODE) FLOOR TO DECK AND PAINT-READY |
| 5.2 | | | | | X | 14' HIGH CLEAR ZONE THROUGHOUT SALES AREA [illegible], AS DEFINED IN TENANT'S PROTOTYPE |
| 5.3 | | | | | X | INTERIOR DEMOLITION (PARTITIONS, CEILINGS, LIGHTING, FLOORING, AND ALL REMNANTS OF PREVIOUS TENANT'S IMPROVEMENTS, ETC), IF APPLICABLE |
| 5.4 | | | X | | | INTERIOR CONCRETE FLOOR SLAB - LEVEL/READY AND FULLY PREPPED, PER TENANT'S PROTOTYPE, FOR NEW RESILIENT FLOORING, CERAMIC TILE AND SHEET GOODS |
| 5.5 | | | | | X | INTERIOR CONCRETE FLOOR SLAB - LEVEL/READY, PER TENANT'S PROTOTYPE, FOR POLISHED CONCRETE FINISH |
| 5.6 | | | | X | | VESTIBULE (INCLUDING WALL/CEILING CONSTRUCTION, INTERIOR AUTOMATIC SLIDING DOORS, INTERIOR ALUMINUM STOREFRONT FRAMING AND GLAZING) |
| 5.7 | | | | | X | GYPSUM BOARD ON PERIMETER SALES WALL, CONTROL JOINTS PER TENANT'S PROTOTYPE, FINISHED FLOOR TO DECK, PAINT-READY |
| 5.8 | | | | X | | INTERIOR PARTITIONS |
| 5.9 | | | | X | | MISC. WOOD BLOCKING |
| 5.10 | | | | X | | ALL INTERIOR FINISHES PER TENANT'S PROTOTYPE (INCLUDING WALL PANELS, CORNER GUARDS, COLUMN WRAPS, ETC...) |
| 5.11 | | | | X | | INTERIOR DOORS WITH TENANT REQUIRED HARDWARE |
| 5.12 | | | | X | | RESTROOM ACCESSORIES AND INSTALLED PER ADA COMPLIANCE |
| 5.13 | | | | X | | SUPPLY CABINETRY/ CASEWORK FOR OFFICES |
| 5.14 | | | | X | | INSTALLATION OF CABINETRY/ CASEWORK FOR OFFICES |
| 5.15 | | | | X | | SUPPLY CABINETRY/ CASEWORK IN BREAK ROOM |
| 5.16 | | | | X | | INSTALLATION OF CABINETRY/ CASEWORK IN BREAK ROOM |
| 5.17 | | | | X | | FIRE EXTINGUISHERS/[illegible] THROUGH TENANT'S NATIONAL ACCOUNT VENDOR |
| 5.18 | | | | X | | STORE FIXTURES AND MERCHANDISING HARDWARE PER TENANT'S SITE SPECIFIC LAYOUT |
| 5.19 | | | | X | | 2X4 FURRING FOR STORE FIXTURE ANCHORING |
| 5.20 | | | | X | | INSTALLATION OF STORE FIXTURES INCLUDING STOCK ROOM FIXTURES |
| 5.21 | | | X | | | CARDBOARD BALER WITH 6" PVC STORAGE TUBE MOUNTED ON WALL BEHIND BALER |
| 5.22 | | | | X | | COMPACTOR EQUIPMENT |
| 5.23 | | | | X | | WINDOW FILM/GRAPHICS AND BLINDS ON STOREFRONT GLASS, WHERE REQUIRED BY TENANT STORE LAYOUT; REVIEWED AND APPROVED BY LANDLORD |

5.3: Premises free of all fixtures, coolers, kitchen equipment, etc. Interior walls have already been removed. Portions of existing east/west structural wall in south portion of space will need to remain as shown on Exhibit B in red. LLD is responsible for demo of non-load bearing walls. Load bearing wall alteration or demo is by JOANN. *See additional Comments.*

| DIVISION OF WORK | AS-IS | EXISTING | NOT APPLICABLE | JO-ANN | LANDLORD | |
|---|---|---|---|---|---|---|
| **6.0 MECHANICAL** | | | | | | |
| 6.1 | | | | X | | DEMOLITION/DISPOSAL OF EXISTING HVAC, CURBS, AND ALL ASSOCIATED DUCTWORK, INFILL INTERIOR WITH DECK LIKE MATERIAL |
| 6.2 | | | | X | | HIGH EFFICIENCY [illegible] UNITS WITH DUCT SMOKE DETECTORS |
| 6.3 | | | | | X | ROOF PENETRATIONS FOR RTU'S, [illegible] |
| 6.4 | | | | | X | STRUCTURAL SUPPORT FOR RTU'S, AS REQUIRED |
| 6.5 | | | | X | X | ROOF CURBS FOR ROOF TOP UNITS |
| 6.6 | | | | X | | [illegible] AND ACCESSORIES PER TENANT'S PROTOTYPE |
| 6.7 | | | | X | | [illegible] |
| 6.8 | | | | X | | [illegible] |
| 6.9 | | | | X | | [illegible] |
| 6.10 | | | | X | | [illegible] |
| 6.11 | | | | X | | [illegible] |

6.1: All roof penetrations to be infilled with insulation and decking material attached to underside of deck. Existing interior unit heaters to remain for tenant construction. 6.2: New prototype is Daikin RTU's. JOANN will be responsible for any RTU screens required by Title 21 code. 6.3: Roof curbs to be provided by JOANN and installed by LLD. *See Additional Comments.*

| DIVISION OF WORK | AS-IS | EXISTING | NOT APPLICABLE | JO-ANN | LANDLORD | |
|---|---|---|---|---|---|---|
| **7.0 PLUMBING** | | | | | | |
| 7.1 | | | | | X | TWO (2) 4" SANITARY PLUMBING SERVICE STUB-INS INTO TENANT SPACE PER TENANT'S REQUIRED LOCATIONS; ONE STUB UP IN [illegible] CONCRETE [illegible] RESTROOMS/WATER COOLERS; ONE STUB UP IN [illegible] CONCRETE [illegible] OUT AT BREAKROOM/MOP SINK |
| 7.2 | | | | | X | PLUMBING (BRANCH LINES) |
| 7.3 | | | | | X | PLUMBING FIXTURES (INCLUDING HOT WATER HEATER) |
| 7.4 | | | | | X | DEDICATED SPRINKLER MAIN ABOVE 10'-0" AFF |
| 7.5 | | | | | X | DEDICATED SPRINKLER BRANCH LINES/UPTURNED HEADS AT ROOF DECK OF SHELL |
| 7.6 | | | | | X | DEDICATED SPRINKLER BRANCH LINES/MODIFICATION OF HEADS DUE TO TENANT INTERIOR BUILD-OUT |
| 7.7 | | | | | X | FIRE SPRINKLER SYSTEM/MONITORING - NEW AND/OR MODIFICATIONS FOR BUILDING SHELL COMPLIANCE WITH CODE |
| 7.8 | | | | X | | FIRE ALARM SYSTEM/MONITORING - MODIFICATIONS DUE TO TENANT INTERIOR BUILD-OUT |

| DIVISION OF WORK | AS-IS | EXISTING | NOT APPLICABLE | JO-ANN | LANDLORD | |
|---|---|---|---|---|---|---|
| **8.0 ELECTRICAL** | | | | | | |
| 8.1 | | | | | X | PREFABRICATED ELECTRICAL POWER WALL UNIT |
| 8.2 | | | | | X | LIGHTING CONTROL PANEL, MISCELLANEOUS PANELS AND RACKS |
| 8.3 | | | | | X | ALL INTERIOR ELECTRICAL DISTRIBUTION, DISTRIBUTION BOXES, ETC. |
| 8.4 | | | | | X | LED INTERIOR LIGHT FIXTURES |
| 8.5 | | | | | X | INSTALLATION OF EXTERIOR BUILDING-MOUNTED LIGHT FIXTURES (WALL PACKS, UNDER CANOPY LIGHTING, EMERGENCY LIGHTING) - WIRING TO BE TERMINATED AT JUNCTION BOX FOR TENANT ELECTRICAL CONTRACTOR |
| 8.6 | | | | X | | EXTERIOR BUILDING-MOUNTED LIGHT FIXTURES (WALL PACKS, UNDER CANOPY LIGHTING, EMERGENCY LIGHTING) - PICK UP AT LANDLORD PROVIDED JUNCTION BOX AND WIRE TO TENANT PANEL |
| 8.7 | | | | | X | FACADE SIGNAGE ELECTRICAL |
| 8.8 | | | | | X | [illegible] POWER FOR SIGN COMPANY/BLOCKING FOR SIGNAGE |
| 8.9 | | | | | X | EMERGENCY, EXIT AND MISCELLANEOUS LIGHT FIXTURES |
| 8.10 | | | | | X | POWER POLES (TENANT'S GENERAL CONTRACTOR TO INSTALL DURING FIXTURE INSTALLATION) |
| 8.11 | | | | | X | DATA CONDUIT (FOR REGISTER SYSTEM) WITH PULL STRING |
| 8.12 | | | | | X | CONDUIT AND JUNCTION BOXES FOR LOW VOLTAGE WIRING PER PROTOTYPE PLANS |
| 8.13 | | | | | X | [illegible] - (COORDINATED BY TENANT'S GENERAL CONTRACTOR) |
| 8.14 | | | | | X | DATA LINES FOR REGISTER SYSTEM - (COORDINATED BY TENANT'S GENERAL CONTRACTOR) |
| 8.15 | | | | | X | [illegible] PREVENTION SYSTEM [illegible] - COORDINATED BY TENANT'S GENERAL CONTRACTOR |
| 8.16 | | | | | X | INSTALLATION OF ELECTRICAL REQUIRED FOR SPECIFIC STORE FIXTURES AFTER INSTALLATION OF THE FIXTURE |
| 8.17 | | | X | | | CARDBOARD BALER ELECTRICAL |
| 8.18 | | | | X | | COMPACTOR ELECTRICAL |

8.8: Existing security light wall packs are in acceptable locations as-is. All new emergency lighting/wrap to be installed by LLD. JOANN will provide under canopy light fixtures and LLD will install these lights only. 8.4: JOANN will provide and install all new exterior light fixtures (under canopy lights to be installed by LLD).

**ADDITIONAL COMMENTS:**

1.4: LLD is proceeding with storefront elevations approved by JAS on 4/30/19 with follow up comments on 5/1/19. JAS will be furnished a copy of the pre-final shell CD's for review prior to city permit submittal. Comments from the JAS team were returned within 10 business days as per the lease agreement.

1.8/2.5/5.2/5.3: Replace the words "Tenant's Prototype" with mutually agreed upon details and specifications by LLD and tenant and will be further defined in the final Shell Matrix to be attached to the Lease.

3.1.3: LLD to relocated existing T/F switches to perimeter wall.

3.14: LLD to bring lighting up to code only as required.

3.15: LLD will install pylon/monument sign at a future date (unspecified).

4.8: One additional egress door will be required. Location was approved by JOANN. All existing egress doors to remain in existing location and be serviced to like new condition.

4.12: LLD to deliver new seals/bumpers. Tenant will provide and install electric EOD leveler.

4.13: JOANN to provide OHD hardware and LLD to install OHD hardware.

4.13: Both existing OHD's are 8'-0" x 9'-4" with a 12" x 24" vision panel. Tenant OHD to be in good working condition.

5.5: Tenant prefers polished concrete slab throughout the Premises and floor covering has already been removed. Existing slab is in poor condition. LLD to ensure all transitions in tenant space are level and all cracks/penetrations are infilled, repaired, and ground to a smooth & flat surface. Grout and any other areas of stain must be ground and removed from the slab.

5.7: LLD and JOANN to agree on taping finish level to be provided. Most all walls are 2x2 wood furred over CMU walls. LLD to install another layer of GWB over top of existing, or new GWB above existing where wall insulation is exposed. LLD will provide control joint layer not more than 30'-0" apart and level 4 finish, not inclusive of a primer coat. JOANN responsible for primer and spot touchup before painting.

6.2: JOANN is responsible to provide drawings to LLD that identify RTU's, their locations, and opening sizes. JOANN responsible for any modifications or corrections to existing building systems should any conflicts occur between new penetrations and existing systems (i.e. joist bridging, sprinkler system piping, or other piping systems relevant to shell operation/function.

LLD WILL BE PERMITTED TO ENCAPSULATE THE EXISTING ASBESTOS CONTAINING MATERIAL FOUND IN THE GYPSUM BOARD JOINT COMPOUND. THE LEAD PAINT THAT WAS FOUND WITHIN THE ROOF STRUCTURE MUST BE ENCAPSULATED PER CODE.

General, Paint supply: Exterior wall (all CMU), light fixtures, and man doors can be be provided by local vendor. Exterior sliding doors and all exterior door hardware must be provided by JOANN's National Account Vendor.

DIVISION OF WORK MATRIX APPROVED AS SHOWN

| | | |
|---|---|---|
| Name (Jo-Ann Stores, Inc.) Real Estate Director | Pres. | 9/9/2019 |
| Name (Owner or Regulating Agent) | MSLC Moreviation | 9/16/19 |
| Name (Jo-Ann Stores, Inc.) Construction Department Representative | Title | Date |

STORE NAME: JOANN Fabrics

STORE ADDRESS: 5301 Old Seward Highway, Anchorage AK

DATE: 4/12/19

REVISED DATE: 8/16/19

University Center Mall: JoAnn Fabrics

MINIMAL REVEALS EIFS OPTION

NORTHPOINT

Exhibit D-1, Page 2

## Exhibit D-1

## Tenant's Anchorage Signage Plans.



Exhibit D-1, Page 1

Exhibit A
Page 66 of 88

**EXHIBIT A**
**Page 68 of 88**

Case 3:20-cv-00272-JMK   Document 1-1   Filed 10/26/20   Page 68 of 88

<u>Exhibit E</u>

**The Project Coordination Guidelines**

# JOANN

**Real Estate Process**

Jo-Ann Stores, LLC, an Ohio limited liability company ("JAS") is a party to that certain lease agreement by and between **Furniture Enterprises of Alaska, Inc.,** an Alaska corporation ("Landlord"), dated _____, 2019 (the "Lease). Capitalized and defined terms used in this Exhibit E shall have the same meanings as those ascribed to them in the Lease, unless the context clearly dictates otherwise.

Administrative Requirements – Addressed in Sections 010000, 011000, 012000, and 013000 on SP101 of FY18 Construction Documents. Forms attached to this document.

Document Review/Delivery Requirements – Addressed in Sections 10 and 2(f) of the Lease. This includes requirements for the Notice of Delivery.

Availability of Inspections – Buildings must be available for inspection by JAS prior to the execution of the Lease and at any point during Landlord's construction or turnover process.

Closeout procedures – Addressed in Section 4 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents. These procedures are also addressed on Section 017000 on SP102 of FY18 Construction Documents.

Approved Vendors – All Turnkey Projects are required to follow this list for fixtures and equipment. Shell Projects to the extent of the scope listed on Exhibit C are required to follow this list. National Account Venders are listed in Required Vender List on cover sheet of FY18 Prototype and/or Construction Documents and on Attachment E – 3.

Submittals – Addressed in Section  013000 on SP101 of FY18 Construction Documents.

Milestones – Addressed in Section 2 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents.

Turnover Criteria - Addressed in Section 3 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents.

Changes to Project Scope – All changes to the responsibilities set forth in Exhibit C (project scope attached to the Lease) must be presented in writing and approved by JAS in advance. Any changes made outside of JAS approval will become the

responsibility of the Landlord.

Definitions – See Section 2 of the Lease.

Site work – Addressed in Section 3 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents.

Architectural – Addressed in Prototype Block Plans, Prototype Construction Documents and Prototype Elevations available on JAS Portal Sites and attached to the Lease.

Plumbing – Addressed in Sections 150100, 150500, 152500, and 102800 on SP104 and 154100, 154400, 154600 and 154900 on SP105 of FY18 Prototype Construction Documents.

Fire Sprinkler – Addressed in Note 3 on P101of FY18 Prototype Construction Documents.  Fire sprinkler requirements are coordinated with the local fire marshal or the authority having jurisdiction.

HVAC – Addressed in Section  156000, 158000, 159000, 159500, 159700, and 159900 on SP105 of FY18 Prototype Prototype and/or Construction Documents.

Electrical Systems
- Fire Alarm System – Addressed in E401 Prototype Construction Documents available on JAS Portal Sites and attached to the Lease.

- Burglar Alarm System – Addressed in E402 Prototype Construction Documents available on JAS Portal Sites and attached to the Lease.

- Electrical System – Addressed in E100 – E700 Prototype Construction Documents available on JAS Portal Sites and attached to the Lease.

Roof – Addressed in Section  075000, 077100,  and 077200 on SP103 of FY18 Prototype Construction Documents.

Slab – Addressed in Section 033000 on SP102 and 096500 on SP104 of FY18 Prototype Construction Documents and also addressed in Sections 2 and 18 of the Lease.

Utilities – Addressed in Section  169000 on SP107 of FY18 Prototype and/or Construction Documents.  In addition, timing for broadband, telephone service and other communication utilities are set forth in section 10 (b) of the Lease.

Temporary Construction and Utilities – Addressed in Section  013000 on SP101 of FY18 Prototype Construction Documents.

Attachment E-1

## Jo-Ann Stores Construction Contacts

### Property Information (Landlord/Developer)

**Landlord**

| | |
|---|---|
| Name | |
| Address | |
| | |
| | |
| Phone | |

**LLD Construction Contact**

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

**JAS Construction Manager**

| | |
|---|---|
| Name | Brent Schrock |
| Office | (330) 463-8544 |
| Fax | |
| Mobile | |
| Email | Brent.Schrock@joann.com |

**Property Manager**

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

**Legal Notice Address**

| | |
|---|---|
| Name | |
| Office | |

### Site Construction Information — Construction type: choose below

**General Contractor:**

| | |
|---|---|
| Name | |
| Address | |
| | |
| Office | |

**Project Manager:**

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

**Site Superintendent:**

| | |
|---|---|
| Name | |
| Site # | |
| Fax | |
| Mobile | |
| Email | |

**Architect:** *(of record)*

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | Brent |

Attachment E-2

# JOANN
## CONSTRUCTION STATUS REPORT - LANDLORD SHELL

**PROJECT INFORMATION**

| STORE #: | | START DATE: | |
|---|---|---|---|

SCHEDULED COMPLETION DATE:

**STORE LOCATION:**

| Shopping Center Name: | |
|---|---|
| Address: | |
| Address: | |
| City / State / Zip: | |

**GENERAL CONTRACTOR:**

| Company Name: | |
|---|---|
| Address: | |
| City / State / Zip: | |
| Site Superintendent: | |
| Site Superintendent Mobile#: | Email: |
| Project Manager: | |
| Project Manager Mobile #: | Email: |

**SCHEDULE COMPLIANCE**

**SITE WORK**    Comments:

**UTILITIES - ROUGH**    Comments:
GAS, WATER, ELECTRIC, SEWER, TELEPHONE.

**UTILITIES - METERS**

| | Meter #'s | Utility Company |
|---|---|---|
| ELECTRIC | | |
| WATER | | |
| GAS | | |

**BUILDING SHELL PROGRESS THIS WEEK:**    Comments:

**LANDLORD SHELL REQUIREMENTS**

| | | | | | |
|---|---|---|---|---|---|
| Demolition | 0% | Sewer Stub-Ups | 0% | Façade/EIFS | 0% |
| Demising Walls | 0% | Sprinkler Heads Up | 0% | Front Slider Door | 0% |
| Gas Service | 0% | RTU Curbs | 0% | Egress Doors and Hardware | 0% |
| Electric Service | 0% | RTU Structural Support | 0% | OVH Door | 0% |
| Water Service | 0% | Floor Prepped & Level | 0% | Exterior Painting | 0% |
| Telephone Service | 0% | Sheetrock Finished | 0% | Parking Lot and Striping | 0% |

Comments:    Overall Construction Completion    0%

Exhibit E, Page 7

Exhibit A
Page 72 of 88

**EXHIBIT A**
**Page 72 of 88**

Case 3:20-cv-00272-JMK   Document 1-1   Filed 10/26/20   Page 73 of 88

**LANDLORD ISSUES:**

| SITE WORK: | Comments: |
|---|---|

| BUILDING EXTERIOR: | Comments: |
|---|---|

| BUILDING INTERIOR: | Comments: |
|---|---|

**NATIONAL ACCOUNT VENDOR ISSUES:**

| PURCHASE ORDERS: | Comments: |
|---|---|

| DELIVERY: | Comments: |
|---|---|

| INSTALLATION: | Comments: |
|---|---|

| VALIDATION: | Comments: |
|---|---|

**INSPECTIONS:**

| COMMENTS: | Comments: |
|---|---|

**LANDLORD OR GC IS REQUIRED TO SUBMIT REPORT AND 8-10 PROGRESS PHOTOS TO JOANN EVERY MONDAY BY 12:00 PM EST, (NOON) VIA AN EMAIL TO THE JOANN CONSTRUCTION PROJECT MANAGER**

Page 2

Exhibit E, Page 8

Exhibit A

Attachment E-3

## JoAnn Stores National Account Vendor List

03/05/2019

**FIRE ALARM/BURGLAR ALARM**
IVERIFY, (aka TRANS ALARM)
500 EAST TRAVELERS TRAIL
BURNSVILLE, MN 55337
GREG VANDEWEEL 440-725-6872
Greg.VanDeweel@iverify.us
KAY STRATING (MAIN CONTACT)
952-227-5326
kay.strating@iverify.us
JENNIFER BROWN
952-227-5945
Jennifer.Brown@iverifysecurity.com
**Vendor # - 302854**

**AUTOMATIC SLIDING DOORS**
ASSA ABLOY ENTRANCE SYSTEMS
300 HORIZON CENTER, SUITE 302
HAMILTON, NJ 08691
PAM HOMYAK
609-249-9502
Pam.Homyak@assaabloy.com
**Vendor # - 211421**

**DOCK DOORS/EQUIPMENT**
CORNELL STOREFRONT SYSTEMS
140 MAFFETT ST. #2
WILKES -BARRE, PA 18705
KRISTA BONAVINA (Main Contact)
kbonavina@cornellstorefronts.com
Office: 800-882-6773 ext. 620
Mobile: 570-991-1962
**Vendor# -**

**DOORS & FRAMES & HARDWARE**
D.H. PACE DOOR SERVICES
218 E. 11TH AVENUE
NORTH KANSAS CITY, MO  64116
MAIN: PAUL SENNE (417-831-5585 X 5102)
ADAM WEST 417-873-1860
JAS@dhpace.com
**Vendor # - 296276**

**ELECTRICAL POWER WALL**
Eaton Corp. c/o  H. LEFF ELECTRIC CO.
4700 SPRING STREET
CLEVELAND, OH 44131
MARK SABATINO
msabatino@leffelectric.com  (216) 452-4886
**Vendor # - 154217**

**ELECTRICAL & LIGHTING**
H. LEFF ELECTRIC CO.
4700 SPRING STREET
CLEVELAND, OH 44131
MARK SABATINO
msabatino@leffelectric.com  (216) 452-4886
**Vendor # - 154217**

**ENERGY MANAGEMENT**
ROTH BROTHERS
3847 CRUM ROAD
YOUNGSTOWN, OH 44515-0209
BEN RIVERA
800-872-7684
ben.rivera@sodexo.com
**Vendor # - 101056**

**FIRE EXTINGUISHER COMMISSIONING**
COMMERCIAL FIRE
2465 ST. JOHN BLUFF RD. S
JACKSONVILLE, FL 32246
SAMANTHA ABRAMSON
800-241-1277 ext 142
JoAnn@commercialfire.com
**Vendor # - 301835**

**All HVAC Equipment**
GARDINER
31200 BAINBRIDGE RD.
P.O. BOX 39280
SOLON, OH 44139
Sharon Dorn 440-248-3400 EXT 1490
SDorn@whgardiner.com
**Vendor # - 154102 + 215301**

**MILLWORK PACKAGE & WINDOW SILLS**
*(PURCHASED BY JOANN STORES, RECEIVED
AND INSTALLED BY GC.)*
ACCEL GROUP
Order through: JOANN STORES, INC.
CHRIS TIMKO (Main Contact)
330-336-0317 ext 2126
chrisBT@accelgrp.com
APRIL KEYSER
330-336-0317 ext  3408
**Vendor # - 214249**

## JoAnn Stores National Account Vendor List

03/05/2019

**FRP MATERIAL AND VESTIBULE CARPET**
Haines, Jones & Cadbury (HJC)
2706 SE OTIS CORLEY DR. STE 6
BENTONVILLE, AR 72712
CULLEN DAVIES (Main Contact)
cullen.davies@hjcinc.com
ARONETTE TEICHMANN
aronette.teichmann@hjcinc.com
Berry Jones  (Acct Rep)
berry.jones@hjcinc.com
(479) 657-0820
**Vendor # - 315898**

**COMPACTOR & BALER**
PTR Baler & Compactor
2207 E. Ontario St.
Philadelphia, PA 19134
STEVE GIBBONS – Account Manager
Office 215-253-2215, cell 215-668-1679
SGibbons@PTRCo.com
ROSALYN CASTRO
800-523-3654 ext- 2230
Joannfabric@ptrco.com
**Vendor # - 318473**

**SIGNAGE**
(for reference only)
APEX SIGN GROUP (SOUTWEST SIGN GROUP)
2570 Boulevard of Generals, Suite 225
Norristown, PA 19403
BUCE HOWAT
484-682-3675
JAS@apexsigngroup.com
Heather Moore
610-209-2306
JAS@apexsigngroup.com
**Vendor # - 317206**

**FLOORING – POLISHED CONCRETE**
CPR, Inc.
2064 HWY 116 CARYVILLE , TN 37714
Brent Sabino (Main Contact)
865-630-1137
bsabino@cprconcrete.com

**PAINT**
THE SHERWIN WILLIAMS CO
10740-C BROADWAY AVE>
GARFIELD HEIGHTS, OH 44125
CHUCK JENNISON (216-554-5737)
charles.jennison@sherwin.com
ACCT. #2196-5387-0
**Vendor # - 130659**

**LOW VOLTAGE WIRING**
**BAILIWICK**
7630 COMMERCE WAY
EDEN PRAIRIE, MN 55344
NICK HEGEL
651-338-4842
nhegel@bailiwick.com

Exhibit E, Page 10

Exhibit A
**EXHIBIT A**
Page 75 of 88
**Page 75 of 88**

Case 3:20-cv-00272-JMK   Document 1-1   Filed 10/26/20   Page 79 of 88

<u>Exhibit G</u>

**Form of Subordination, Non-Disturbance and Attornment Agreement**

**When recorded, return to**:
Jo-Ann Stores, LLC
Attn: Wendy Blasick, Paralegal
5555 Darrow Road
Hudson, OH 44236

**This instrument was prepared by:**

Robert D. Icsman
Jo-Ann Stores, LLC
5555 Darrow Road
Hudson, OH 44236

_____ SPACE ABOVE THIS LINE FOR RECORDER'S USE
**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

This Subordination, Non-Disturbance and Attornment Agreement (the "Agreement") is made as of _____, 20__, by **[LENDER]** ("Lender"), **[LANDLORD]** ("Landlord"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant").

Reference is made to a loan (the "Mortgage") from Lender to Landlord, dated _____, and recorded on _____, as instrument number _____, in _____, _____ County, [State].

Reference is made to a lease dated _____, _____ [and all subsequent amendments and modifications] by and between Tenant and Landlord (the "Lease") of certain premises situated within the property known as [Shopping Center] located in Anchorage, Alaska, and as legally described on Exhibit A attached hereto and incorporated by reference herein and covered by said Mortgage.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in consideration of the mutual promises contained herein, the parties agree as follows:

     1. Lender consents to the Lease and the provisions thereof.

     2. Subject to the terms hereof, the Lease is and will be subject and subordinate at all times to the lien of the Mortgage and to all renewals and extensions of the Mortgage ("Amendments") to the full extent of all amounts secured thereby and interest thereon, provided that such Amendments do not expand Tenant's obligations or limit Tenant's rights under the

Lease (except as agreed to in this Agreement).

3. If the holder of the Mortgage, or any person claiming under the holder (whether by a foreclosure, deed in lieu of foreclosure, or otherwise), succeeds to the interest of Landlord in the Lease, then Tenant will recognize and attorn to the holder, or such other person, as its landlord under the Lease.

4. In the event of foreclosure or other right asserted under the Mortgage by the holder thereof, the Lease and all of the rights of Tenant thereunder will continue in full force and effect and will not be terminated or disturbed (whether by a foreclosure, deed in lieu of foreclosure, or otherwise), except in the case of a material default by Tenant under the Lease continuing after notice to Tenant and beyond any applicable notice and cure period, and otherwise in accordance with the Lease. Tenant will not be subject to any pre-foreclosure remedies asserted under the Mortgage or related loan documents. Lender will not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage, unless applicable law requires Tenant to be made a party as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in the action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement.

5. If Lender succeeds to the interest of Landlord under the Lease, Tenant will have the same rights and remedies against Lender for any default under the Lease, but Lender will not be:

(a) liable for any act or omission of any prior landlord (including Landlord) under the Lease, except for non-monetary defaults of a continuing nature of which Lender has received notice, and latent or patent defects in construction to the same extent that any prior landlord would be liable, but nothing herein will limit Lender's maintenance and repair obligations in its capacity as landlord under the Lease;

(b) subject to any off-sets or abatements against rent that Tenant may have against any prior landlord (including Landlord) under the Lease, except (1) for those which, as of the date of foreclosure, were already commenced or notice of their commencement was sent; (2) for the exercise of rights set forth in the Lease; and (3) for those relating to continuing defaults identified in subsection (a) above. Nothing in this sub-section is deemed to exclude Lender from responsibility for repairs and maintenance obligations in its capacity as landlord under the Lease from and after the date Lender takes title to the Premises, whether or not the need for such repairs or maintenance accrued before or after such date;

(c) bound by any Fixed Minimum Rent that Tenant might have paid for more than the current month to any prior landlord (including Landlord), except as expressly required under the Lease or actually received by Lender;

(d)     bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one month in advance to Landlord or any prior landlord unless (1) such sums are actually received by Lender or (2) such prepayment was approved by Lender; and

(e)     bound by any amendment or modification to the Lease that shortens the term of the Lease or reduces the rent owed thereunder without the prior consent of Lender, and if Lender does not respond to a request within 15 days, then consent will be deemed given by Lender; Landlord is responsible for securing all consents required by Lender.

6. In the event of any casualty or condemnation (eminent domain), Lender must permit the insurance proceeds or the condemnation award, as the case may be, to be used for any restoration and repair as required by the Lease.

7. Except as provided herein, this Agreement does not constitute a waiver by Lender of any of its rights under the Mortgage or related documents, and the Mortgage and any related documents remain in full force and effect and will be complied with in all respects by Landlord.

8. No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder will be valid or effective unless in writing and signed by the parties.

9. Nothing herein will amend, waive or rescind any provision or condition of the Lease, or relieve the Landlord from any of its obligations under the Lease.

10. Tenant will provide a courtesy copy concurrently to Lender of any notice of default (or breach) from Tenant to Landlord that would allow Tenant to terminate the Lease. Lender will have the same time allowed to the Landlord, after Landlord's receipt of notice, to cure the default giving rise to the termination. The opportunity to cure granted to Lender will be available to Lender only to the extent such opportunity to cure is available to Landlord under the Lease, and such cure period afforded to Lender will run concurrently with the cure period available to Landlord. Notwithstanding the foregoing, Lender will have no obligation to cure any default by Landlord except if Lender succeeds to title of the property.

11. Any notices from one party to the other must be in writing and sent via courier (e.g., UPS, Federal Express) or by certified U.S. mail to the following addresses:

if to Tenant:     Jo-Ann Stores, LLC
                    Attn: Vice President, Real Estate
                    5555 Darrow Road
                    Hudson, OH 44236

With a copy to:     Jo-Ann Stores, LLC
                    Attn: Senior Legal Counsel
                    5555 Darrow Road

Hudson, OH 44236

if to Lender:          [LENDER]

with a copy:          _____

12. Landlord represents and warrants to Tenant that all prior mortgages and deeds of trust encumbering the Premises demised under the Lease have been satisfied or will be satisfied with the proceeds of the Mortgage.

13. This Agreement inures to and binds the successors and assigns of the respective parties.

14. This Agreement is not effective against Tenant unless and until Tenant has received an original of this Agreement signed by all parties.

15. This Agreement will be deemed to be a contract entered into under the laws of [State] and will in all respects be governed, construed, applied and enforced in accordance with the laws of [State].

16. This Agreement may be signed in multiple counterparts, each of which shall constitute an original and all of which taken together constitute one and same agreement.

[The remainder of this page is intentionally left blank]

**Lender's Acknowledgment**

STATE OF _____ )
                                        ) SS
COUNTY OF _____ )

      BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, a[n] _____, by _____, its _____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this _____ day of _____, 20__.

                                  _____
                                        NOTARY PUBLIC

**Landlord's Acknowledgment**

STATE OF _____ )
                                        ) SS
COUNTY OF _____ )

      BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, a[n] _____, by _____, its _____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this _____ day of _____, 20__.

                                  _____
                                        NOTARY PUBLIC

<u>Exhibit H</u>

**Form of Estoppel Certificate**

To:                                                                      , together with its successors and assigns

Shopping Center:            located in Anchorage, Alaska

Landlord:

Tenant:                        Jo-Ann Stores, LLC, an Ohio limited liability company

Lease:                        Lease by and between Landlord and Tenant dated _____ ___, 20__
                             (the "Original Lease"), as modified by (the "Lease") (together, the "Lease)[two]
                             (collectively, the "Lease") [three or more]

Tenant represents that, as of the date hereof:

1.  The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2.  The Lease is in full force and effect. The term commenced on _____ and expires on _____. [Tenant has _____ ( ) 5-year options to renew the term thereof.] [Tenant has one 5-year option to renew remaining] [Tenant has no options to renew the term of the Lease.]

3.  Tenant has taken possession of the premises demised under the Lease (the "Premises") and is occupying the Premises.

4.  To the undersigned's actual knowledge, without inquiry or investigation, the Landlord is not currently in default under the Lease, except as follows: _____, and Tenant reserves all rights and remedies with regard to the aforementioned issues [.]  [; provided, however, that common area, tax and insurance reconciliation(s) have not been received from Landlord for the following years: [Insert Years]].  With regard to any and all common area, tax and insurance expenses, Tenant specifically reserves all rights and remedies with respect to any overpayments which may be discovered subsequent to the date of this Estoppel Certificate regardless of the year in which the overpayment occurred, including but not limited to the right to seek reimbursement or offset for any overpayments.  [In addition, Tenant specifically advises that it is auditing Landlord's common area, tax and insurance expenses; to date, there have been no findings, but the audit is still open, and Tenant reserves any and all rights and remedies with respect thereto.]

    Furthermore, Tenant has not inspected the Shopping Center, including the common areas, to verify that Landlord is in compliance with its obligations with respect thereto, and Tenant hereby reserves all rights regarding the same.

5.  The monthly Fixed Minimum Rent payable under the Lease is $[_____] and has not been prepaid by more than one month. [Tenant is not paying fixed monthly rent. Rather, Tenant is paying Substitute Rent, as defined in the Lease. The monthly Substitute Rent varies each month according to store sales. Substitute Rent has not been prepaid.]

6. No security deposit has been made in connection with the Lease.

7. Tenant does not have any option or preferential right to purchase all or any part of the Shopping Center.

8. The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, LLC
> Attn: National Director of Real Estate
> 5555 Darrow Road
> Hudson, OH 44236
>
> with a copy to:
>
> Jo-Ann Stores, LLC
> Attn: Senior Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

9. Nothing contained herein will: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which the undersigned does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve the Landlord from any of its obligations under the Lease.

10. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

11. If there is any conflict between this certificate and the Lease, the Lease shall control.

12. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant will not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.

13. The undersigned representative of Tenant is duly authorized to execute this instrument on behalf of Tenant.

Dated: _____, 2019

**JO-ANN STORES, LLC**

By: _____

Name: _____

Title: _____

## Jennifer Coughlin

| | |
|---|---|
| **From:** | David Geibel <david.geibel@joann.com> |
| **Sent:** | Friday, November 01, 2019 8:48 AM |
| **To:** | Jolene Anderson; David Cavitt; Royal Field |
| **Cc:** | Nicole Sluser; Steve Maher; Jamie Wagner; Melissa Smith; Brandon Adams |
| **Subject:** | JOANN Stores Shell Site Visit 11/29/19 |

---

CAUTION: [WARNING] This is an external email, please use caution and verify the sender is correct. Do not open any links or attachments that you find suspicious in nature.

---

Dave, Jolene, and Royce,

It was a pleasure meeting all of you on Tuesday. We are excited to be coming to this new location. The space looks great.

Here are our notes from the site visit. We will prepare a conditional acceptance letter noting just the few items that you will be completing. Once we have confirmation the items have been completed an unconditional letter will be issued.

Thank you


**Anchorage, AK – Landlord shell turnover notes 11/29/19**


Items listed below were discussed / addressed during the walk through that was attended by Joann, MJM, building owner and their GC (following order of Matrix):


1.9      Roof inspection information was provided to David; no further action needed. Later during the roof walk, standing water was noted in a number of locations due to clogged drains. Landlord to remove leaves/debris from roof and drains and will unclog drains


1.14     Sanitary being utilized had been scoped and found to be clear


2.10     Plywood phone board is installed and grounded; with 25 pairs and 2" conduit.


2.13     Sprinkler system is installed as expected; including dedicated flow and tamper alarm.

3.5     Parking resealing and striping beyond the scope of this project will take place in the Spring.

3.11    Dumpster bollards are installed and do not have sleeves.  Approved

3.13    Bollards adjacent to sidewalk at the loading area will require sleeves (two total). Landlord to install

4.11    Landlord to remove the bumpers and seals on the overhead door intended for the compactor. Landlord will remove the overhead door later (landlord scope) to maintain a secure building. Joann GC will coordinate removal with Landlord when GC infills the opening and adds the compactor door. Landlord will remove and retain the door for future use.

4.16    All exit doors appear to have the correct hardware

5.1     Conflict between matrix and landlord construction plans – the demising wall is noted to be paint ready but the plans call for paint ready to stop at the offices.  The compromise is for landlord GC is to provide paint ready demising wall to ceiling height in Break, Office, etc.  There was a gap in the instructions in the matrix, shell CD's and TI cd;s regarding the finish expectations in the exterior wall of stock room.  Plywood is being installed.

5.2     Sprinkler lines are held above 14' with the exception of the FDC pipe running along the exterior wall.  It is being scheduled and moved above 14' by LLD

6.3     RTU framing supports and curbs are installed as required.  There are seven penetrations in total including a plumbing vent stack that can be utilized.

7.1     The matrix took precedence over plan comments and the leave-outs were not provided.  Now to be part of **Joann scope**

7.4     FDC line is too low and is being relocated.

7.7     All monitoring is installed.  Note – the fire riser is designed to be visible to the sales floor which will not work in the current plan design.  A wall enclosing the entire riser will need to be installed under the **Joann work scope**.

Exhibit B
Page 2 of 3

8.5     Wall packs are installed as noted in the matrix; notes on plans require Joann GC to connect to run power and confirm the lights are operational.

8.8     5/8" FRT plywood is installed behind the sign and a j-box provided

Additional notes during walk-through:

- The floor was flat, filled and sanded; a very good final product.
- All plumbing should be tied to the riser located where the restrooms are designed.  This is picked up in the plumbing drawings but could be noted during pre-con call.
- Keys are with the shell GC; Jolene or Mike who is the property manager can assist in transferring these to the TI GC.
- David described the technology to be designed in this store
- Reviewed the issue with the scope of gyp bd at length before the decision was made to compromise.
- No monument sign is being installed.
- We toured the roof, found standing water but all else was in order.

--
**David Geibel**
Manager, Construction and Store Facilities  |
330.463.8637



CONFIDENTIALITY/EMAIL NOTICE: The material in this transmission contains
confidential and privileged information intended only for the addressee.
If you are not the intended recipient, please be advised that you have
received this material in error and that any forwarding, copying, printing,
distribution, use or disclosure of the material is strictly prohibited.
If you have received this material in error, please (i) do not read it,
(ii) reply to the sender that you received the message in error, and
(iii) erase or destroy the material. Emails are not secure and can be
intercepted, amended, lost or destroyed, or contain viruses. You are deemed
to have accepted these risks if you communicate with us by email. Thank you.



**JOANN**

5555 Darrow Road
Hudson, OH 44236
Ph: (330) 463-3411
Fax (330) 463-6660

Via: Fed-Ex                                                November 18, 2019

Furniture Enterprises of Alaska, Inc.
Attn: Jolene Anderson
940 East 38th Avenue
Anchorage, AK 99503

 Re: Lease dated August 08, 2019 between Furniture Enterprises of Alaska, Inc. ("Landlord")
and Jo-Ann Stores, LLC ("Tenant") -Store #2545 University Center, Anchorage, AK.

Dear Landlord:

Please be advised that no agent or non-employee representative of Tenant has the authority to accept
delivery of the Premises (as defined in the Lease). Only direct employees of Tenant (or its corporate
affiliate) with a title of Director or above can accept delivery, which acceptance must be in writing.
Any purported acceptance by a non-authorized person or that is not in writing prior to this letter is
hereby disavowed.

Notwithstanding anything to the contrary in the Lease, the Estimated Delivery Date as indicated in
the Lease was **11/04/2019**. Tenant hereby conditionally accepts delivery of the Premises on that date
pending completion of any punch list items that are the Landlord's responsibility noted on the
turnover walk-thru notes and report from 10/29/2019. (Copy attached.)

Nothing in this letter shall waive any of Tenant's rights under the Lease, at law or in equity. Tenant
shall continue to occupy the Premises and perform Tenant's Work pursuant to its right to do so under
the Lease.

Sincerely,
**Jo-Ann Stores, LLC**

Craig Edge,
Vice President, Store Development & Facilities

cc:     Kevin Beegle, Tim Chapman, Bryan Evans, Chris Ciancio, Real Estate Accounting

Exhibit **EXHIBIT A**

Case 3:20-cv-00272-JMK   Document 1-1   Filed 10/26/20   Page 86 Page 386 of 88

**Anchorage, AK – Landlord shell turnover notes** 12/29/19

Items listed below were discussed / addressed during the walk through that was attended by Joann, MJM, building owner and their GC (following order of Matrix):

1.9      Roof inspection information was provided to David; no further action needed.  Later during the roof walk, standing water was noted in a number of locations due to clogged drains. Landlord to remove leaves/debris from roof and drains and will unclog drains

1.14     Sanitary being utilized had been scoped and found to be clear

2.10     Plywood phone board is installed and grounded; with 25 pairs and 2" conduit.

2.13     Sprinkler system is installed as expected; including dedicated flow and tamper alarm.

3.5      Parking resealing and striping beyond the scope of this project will take place in the Spring.

3.11     Dumpster bollards are installed and do not have sleeves.  Approved

3.13     Bollards adjacent to sidewalk at the loading area will require sleeves (two total). Landlord to install

4.11     Landlord to remove the bumpers and seals on the overhead door intended for the compactor. Landlord will remove the overhead door later (landlord scope) to maintain a secure building. Joann GC will coordinate removal with Landlord when GC infills the opening and adds the compactor door. Landlord will remove and retain the door for future use.

4.16     All exit doors appear to have the correct hardware

5.1      Conflict between matrix and landlord construction plans – the demising wall is noted to be paint ready but the plans call for paint ready to stop at the offices.  The compromise is for landlord GC is to provide paint ready demising wall to ceiling height in Break, Office, etc.  There was a gap in the instructions in the matrix, shell CD's and TI cd;s regarding the finish expectations in the exterior wall of stock room.  Plywood is being installed.

5.2      Sprinkler lines are held above 14' with the exception of the FDC pipe running along the exterior wall.  It is being scheduled and moved above 14' by LLD

6.3      RTU framing supports and curbs are installed as required.  There are seven penetrations in total including a plumbing vent stack that can be utilized.

7.1      The matrix took precedence over plan comments and the leave-outs were not provided.  Now to be part of **Joann scope**

7.4      FDC line is too low and is being relocated.

7.7      All monitoring is installed.  Note – the fire riser is designed to be visible to the sales floor which will not work in the current plan design.  A wall enclosing the entire riser will need to be installed under the **Joann work scope**.

8.5 Wall packs are installed as noted in the matrix; notes on plans require Joann GC to connect to run power and confirm the lights are operational.

8.8 5/8" FRT plywood is installed behind the sign and a j-box provided

Additional notes during walk-through:

- The floor was flat, filled and sanded; a very good final product.
- All plumbing should be tied to the riser located where the restrooms are designed. This is picked up in the plumbing drawings but could be noted during pre-con call.
- Keys are with the shell GC; Jolene or Mike who is the property manager can assist in transferring these to the TI GC.
- David described the technology to be designed in this store
- Reviewed the issue with the scope of gyp bd at length before the decision was made to compromise.
- No monument sign is being installed.
- We toured the roof, found standing water but all else was in order.

## Discovery Items when GC arrived 12/4/19

Construction Drawings and Matrix call for Landlord to cut out roof penetrations for new RTUs. David Cavitt asked for JOANN to perform and he would reimburse once it was confirmed this was in the Landlord Scope.

| DIVISION OF WORK | AS-IS | EXISTING | NOT APPLICABLE | JO-ANN | LANDLORD | SHELL PROJECT |
|---|---|---|---|---|---|---|

| 6.0 MECHANICAL | | | | | | |
|---|---|---|---|---|---|---|
| 6.1 | | | X | | | DEMOLITION/DISPOSAL OF EXISTING HVAC, CURBS, AND ALL ASSOCIATED DUCTWORK, INFILL INTERIOR WITH DECK LIKE MATERIAL |
| 6.2 | | | X | | | HIGH-EFFICIENCY TRANE HVAC UNITS WITH DUCT SMOKE DETECTORS |
| 6.3 | | | | X | | ROOF PENETRATIONS FOR RTU'S, VENTS, & FLUES |
| 6.4 | | | | | X | STRUCTURAL SUPPORT FOR RTU'S, AS REQUIRED |
| 6.5 | | | | | X | ROOF CURBS FOR ROOF TOP UNITS |
| 6.6 | | | X | | | HVAC - INTERIOR DISTRIBUTION DUCTWORK AND ACCESSORIES PER TENANT'S PROTOTYPE |
| 6.7 | | | X | | | TEMPORARY THERMOSTATS ON COLUMNS NEAR EACH RTU |
| 6.8 | | | X | | | ENERGY MANAGEMENT SYSTEM AND TEMPERATURE SENSORS |
| 6.9 | | | X | | | AIR BALANCE OF HVAC SYSTEM TO TENANT PROTOTYPE STANDARDS |
| 6.10 | | | X | | | STOCK ROOM HEATER |
| 6.11 | | | X | | | VESTIBULE HEATER |